**Gilbert P. HYATT, Plaintiff–Appellant,**

v.

**John J. DOLL, Acting Director, Patent and Trademark Office, Defendant–Appellee.**

No. 2007–1066.

United States Court of Appeals, Federal Circuit.

Aug. 11, 2009.

Kenneth C. Bass, III, Sterne, Kessler, Goldstein & Fox P.L.L.C., of Washington, DC, argued for plaintiff-appellant. On the brief were Wilma A. Lewis and Michael I. Coe, Crowell & Moring LLP, of Washington, DC. Of counsel on the brief was Gregory L. Roth, Law Offices of Gregory L. Roth, of La Palma, CA. Of counsel was Michael L. Martinez, Crowell & Moring LLP, of Washington, DC, and J. Robert Chambers, Wood Herron & Evans, LLP, of Cincinnati, OH.

William G. Jenks, Associate Solicitor, Office of the Solicitor, United States Patent and Trademark Office, of Arlington, VA, argued for defendant-appellee. With him on the brief was Robert J. McManus, Associate Solicitor. Of counsel was Raymond T. Chen, Acting Solicitor, and Thomas W. Krause, Associate Solicitor.

Before MICHEL, Chief Judge, DYK and MOORE, Circuit Judges.

Opinion for the court filed by Chief Judge MICHEl. Dissenting opinion filed by Circuit Judge MOORE.

MICHEL, Chief Judge.

Plaintiff–Appellant Gilbert P. Hyatt appeals from the grant of summary judgment in favor of Jon Dudas, in his official capacity as the Director of the United States Patent and Trademark Office ("PTO"),[1] sustaining the decision of the

---

1. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), John Doll was substituted for

Board of Patent Appeals and Interferences ("Board") to uphold the examiner's rejection of 79 of the 117 claims of Hyatt's U.S. Patent Application Serial No. 08/471,702 ("the '702 application") as not supported by adequate written description. The appeal was argued on April 7, 2008. It is clear from the record that under our caselaw Hyatt had an affirmative and specific duty to disclose to the PTO the evidence excluded by the district court, and was so notified by the PTO, but willfully refused to cooperate in the examination process. On the facts of this case, we uphold the district court's exclusion of Hyatt's evidence. We therefore hold that the district court correctly granted summary judgment sustaining the Board decision because Hyatt offered no other evidence and the Board's decision was based on findings of fact and factual conclusions, all of which are supported by substantial evidence, and thus we affirm.

## I.

### A. Proceedings Before the Examiner

Hyatt is the sole listed inventor on the '702 application. Hyatt has been registered as a patent agent since 1975 and prosecuted the application wholly on his own.[2]

The '702 application relates to computer and software technology and is entitled "Improved Memory Architecture Having a Multiple Buffer Output Arrangement." Hyatt filed the '702 application on June 6, 1995. J.A. 10001. The '702 application is a continuation or continuation-in-part of several earlier applications, some of which were themselves continuations or continuations-in-part. J.A. 10004. When first filed, the '702 application claimed priority back to 1984; Hyatt later amended the application to claim priority back to 1975. J.A. 10756–57.

The '702 application as originally filed had 15 claims, a 238–page specification, and 40 pages of drawings. J.A. 10000–293. It also incorporated by reference multiple publications (such as the "Texas Instruments, ALS/AS Logic Circuits Data Book, 1983"), J.A. 10173–74, and a "disclosure document ha[ving] copies of many of" a list of referenced documents; on the list were manuals and specification sheets of products such as the "Viewpoint/3A Plus" and the "Siemens OEM Floppy Disk Drive FDD 100–8". J.A. 10239–40. After several rounds of amendments to the specification and the claims, Hyatt ultimately cancelled all 15 original claims and added 117 new claims. J.A. 4. New claim 107 is not atypical:

A process of operating a memory system comprising the acts of:

generating input image information;

storing a two dimensional array of blocks of pixel image information by a two dimensional pixel block memory, the two dimensional array of blocks of pixel image information arranged in a two dimensional array of rows and columns of blocks of pixel image infor-

---

Dudas upon Dudas's resignation as Director.

**2.** Hyatt is also familiar with this court. *See Hyatt v. Dudas,* 551 F.3d 1307 (Fed.Cir.2008); *Hyatt v. Dudas,* 267 Fed.Appx. 944 (Fed.Cir. 2008); *Hyatt v. Dudas,* 492 F.3d 1365 (Fed. Cir.2007); *In re Hyatt,* 243 F.3d 554 (Table) (Fed.Cir.2000); *In re Hyatt,* 211 F.3d 1367 (Fed.Cir.2000); *Hyatt v. Boone,* 146 F.3d 1348 (Fed.Cir.1998); *In re Hyatt,* 108 F.3d 1393 (Table) (Fed.Cir.1997); *In re Hyatt,* 106 F.3d 424 (Table) (Fed.Cir.1996); *In re Hyatt,* 925 F.2d 1478 (Table) (Fed.Cir.1991); *In re Hyatt,* 852 F.2d 1292 (Table) (Fed.Cir.1988); *In re Hyatt,* 770 F.2d 182 (Table) (Fed.Cir. 1985); In re *Hyatt,* 770 F.2d 181 (Table) (Fed. Cir.1985); *In re Hyatt,* 770 F.2d 178 (Table) (Fed.Cir.1985); *In re Hyatt,* 714 F.2d 160 (Table) (Fed.Cir.1983); *In re Hyatt,* 708 F.2d 712 (Fed.Cir.1983); *In re Hyatt,* 714 F.2d 160 (Table) (Fed.Cir.1983).

mation, wherein the blocks of pixel image information have boundaries there between;

generating write addresses and generating read addresses;

writing the two dimensional array of blocks of pixel image information into the two dimensional pixel block memory in response to the input image information and in response to the write addresses;

generating a first clock signal having a first clock rate;

accessing blocks of pixel image information in response to the read addresses, wherein the accessing of blocks of pixel image information from the two dimensional pixel block memory is at a first information rate in response to the first clock signal;

generating block boundary smoothing information to smooth the pixel image information at boundaries between blocks of pixel image information;

storing weight information by a weight memory;

generating accessed weight information by accessing the weight information stored by the weight memory;

generating smoothed weighted image information by weighting the pixel image information contained in the accessed blocks of pixel image information in response to the accessed weight information and in response to the block boundary smoothing information;

generating a second clock signal having a second clock rate that is different than the first clock rate of the first clock signal; and

generating output smoothed weighted image information in response to the smoothed weighted image information, wherein the generation of the output smoothed weighted image information is at a different information

rate than the first information rate in response to the second clock signal. J.A. 10472–73.

In a January 7, 1997 office action, the examiner described Hyatt's final amendment as incomplete, stating:

Applicant also has failed to point out where in the specification support may be found for the amended and added claims. MPEP 714.02 states "Applicant should also specifically point out the support for any amendments made to the disclosure." The disclosure includes the claims.

Since the response appears to be *bona fide,* but through an apparent oversight or inadvertence failed to provide a complete response, applicant is required to complete the response within a TIME LIMIT of ONE MONTH from the date of this letter or within the time remaining in the response period of the last Office action, whichever is longer.

J.A. 10493. Hyatt responded a month later with further amendments to the specification and drawings J.A. 10498–503. and the following indication of where support for the 117 new claims and amendments to the specification could be found:

Representative antecedent basis includes page 23:2–19 for data compression; page 50:6–9 for the frame buffer; the section entitled "LOGIC BOARD" "Address Generators" at pages 117–127 for the address generator; the section entitled "MEMORY ARCHITECTURE" at pages 25–62 and the section entitled "MEMORY BOARDS" at pages 128–135 for the block memory having accessing, writing, and processing circuits; the section entitled "GRAPHICS PROCESSOR" at pages 9–14, the program listing at pages 214–30, and pages 29–31, 41, 42, 45, and 50 for the vector generator and processor; the section entitled "SPATIAL FILTERING" at

pages 15–24 and the program listing at pages 231–236 for the spatial processor; and pages 33:15–24:11 for the transform processor.

The Examiner is further referred to the Table of Contents (see the Preliminary Amendments) for additional antecedent basis.

J.A. 10504–05.

In October 1997, the examiner issued a final office action rejecting all 117 of Hyatt's claims for lack of adequate written description, lack of enablement, double patenting, anticipation, or obviousness. J.A. 10634–64. The examiner rejected groups of claims for lack of written description and enablement based on the following thirteen limitations and groups of limitations:

- "a data decompressed video image input circuit generating data decompressed image information"
- "a writing circuit and an accessing circuit for writing and reading a block of video pixel image data into the block memory" and "the process of writing and reading a block of video pixel image data into the block memory"
- "a vector processor responsive to an accessed block of video pixel image information and to vector information"
- "a processor responsive to an accessed block of video pixel image information"
- "a spatial processor responsive to an accessed block of video pixel image information and to vector information and generating data compressed video"
- "a frequency domain processor," "generating frequency domain image information," and "frequency domain information"
- "a block processor responsive to an accessed block of pixel image information and to vector information"
- "[a]n input weight circuit generating input weight information," "an address

generator which will generate weight addresses," "an address generator which will apply the weight addresses to the inputs of RAMS U5E and U6E at the same time the intensity bits are being applied to RAMS U3E and U4E," and "an address generator which will generate weight addresses for selecting weight values from the weight table to perform the desired weighting function at the spatial filter" (collectively, "the 'weight' limitations")
- "block boundary smoothing"
- "that the memory system is a video image data compression system"
- "a quantization weighting processor"
- "generating data compressed video image information"
- "the act of making a product in response to image information"

J.A. 10638–56. In some of his written description rejections, the examiner indicated the closest match he could find between the claim language and the disclosure of the specification. For example, the examiner stated "Claims 1–14, 17–20, 22–25, 34–37, 42–45, 49–52, 81–85, 95–112, 117, and 188 claim a writing circuit and an accessing circuit for writing and reading a block of video pixel image data into the block memory. These claims cover *simultaneous* writing and reading of a block of graphic image data. . . . The specification describes a *sequential* write to and read from the block memory." J.A. 10641. For the majority of the written description rejections, however, the examiner merely stated a claim limitation—such as "a quantization weighting processor," "a video image data compression system," and "a spatial processor responsive to an accessed block of video pixel image information and to vector information and generating data compressed video"—was "not enabled" or "not described in the specification." *See, e.g.*, A10645, 10652–53.

## B. Proceedings Before the Board

In September 1998, Hyatt—continuing to represent himself—appealed the examiner's final rejection to the Board. J.A. 10936. Hyatt's brief presented such arguments as "The '112–1 rejections are *prima facie* erroneous because the disclosure is presumptively valid and correct," J.A. 10824, "The disclosure is significant ..., comprising over 200 pages of description with **detailed schematic diagrams** showing actual commercially available electrical **components** in well known schematic symbol form and even showing component **pin** designations and **wire** connections," J.A. 10827, and "With the extensive memory disclosure (*e.g.*, Spec. at 99–135) and processor disclosure (*e.g.*, Spec. at 87–98, 214–36) in the instant application, it is unbelievable that the Examiner would object to the disclosure of memory and processor features," J.A. 10831. In addition, he included a document entitled "Table–1" (reproduced below), which he had not provided to the examiner, purporting to give examples of support:

TABLE–1

| REPRESENTATIVE TERMINOLOGY | NOTES [22] | OCCURRENCES | REPRESENTATIVE CITES PAGE(S) |
|---|---|---|---|
| access | A | >100 | 25–83, 128–164 |
| address | A | >500 | 25–83, 128–164 |
| block | A | >80 | 25–83, 128–164 |
| boundary | | =3 | 14, 41 |
| compress | | =4 | 23 |
| data compressed | | =1 | 23 |
| decompressed | | =1 | 23 |
| frequency (FFT) | C | =7 | 33–34 |
| graphic | D | >20 | 9–14, 214–230 |
| image | | >50 | 50–55 |
| information | | >100 | THROUGHOUT |
| input | | >200 | THROUGHOUT |
| memory | A | >400 | 25–83, 128–164 |
| pixel | | >300 | THROUGHOUT |
| processor | | >50 | 85–98 |
| quantization | E | >100 | 231–236 |
| read | A | >50 | 25–83, 128–164 |
| simultaneous | | >8 | 36, 45, 46, 50 |
| smoothing | | =1 | 232 |
| spatial | B | >20 | 15–24, 231–236 |
| vector | D | >50 | 9–14, 214–230 |
| video | | =8 | 77, 166, 168–171 |
| weight | F | >100 | 162–164 |
| write | A | >100 | 25–83, 128–164 |

J.A. 10832–34. In accompanying notes, Hyatt asserted that certain broad categories of "terminology" were disclosed in certain textual sections of the specification and in raw source code appearing in the specification. J.A. 10833–34. For example, in note "A" (associated with the terms "access," "address," "block," "memory," "read," and "write"), Hyatt stated that Memory terminology; including memory access, memory read, memory write, and memory block terminology; is disclosed, for example, in **two whole sections** entitled "MEMORY ARCHITECTURE" and "MEMORY BOARDS" (Spec. at 25–62 and 128–35 and Figs. 6E–6N) and in **two additional whole sections** entitled "BUFFER MEMO-

RY" and "BUFFER BOARD" (Spec. at 63–83 and 136–58 and Figs. 6W–6AF). J.A. 10833. Although Hyatt presented thirty-six pages of general argument that the written description and enablement rejections should be reversed, J.A. 10823–58, Hyatt did not separately address—and did not indicate where in the specification support could be found for—any of the claim limitations the examiner determined lacked support, except for the limitation "making a product," J.A. 10836–40, and the group of "weight" limitations. J.A. 10835. Hyatt made general statements that Table–1 and the table of contents of his specification indicated that support for the relevant limitations existed in his specification. J.A. 10827, 10831. Hyatt also argued that lists of twenty-nine publications had been incorporated by reference into the specification and provided enabling disclosure. J.A. 10848–51. Aside from the "making a product" and the "weight" limitations, Hyatt did not correlate Table–1, his table of contents, or any of the incorporated-by-reference publications with particular limitations.

Although reversing some of the examiner's written description and enablement rejections, the Board sustained the written description and enablement rejections for seventy-nine claims in a July 2002 decision. J.A. 11638. The Board addressed each of the claim limitations relied on by the examiner. The Board rejected Table–1 as unhelpful in identifying written description support:

> We agree with the examiner that merely pointing to isolated words scattered throughout the specification does not describe the invention claimed as a combination of elements, functions, and interconnections, anymore than a dictionary provides written description support for a book where words are used in combination to provide a certain meaning.

J.A. 11594. The Board even considered Table–1 "misleading" in that it indicated that the word "quantization" appeared in the specification, while the specification actually contained the "%" symbol and the arithmetic functions "FIX(exp)" and "INT(exp)." J.A. 11617.

The Board nevertheless reversed the examiner's rejections of thirty-eight of the claims. J.A. 11638. The Board reviewed the entire specification, looking for support for each of the claim limitations at issue and found support for three of the limitations (such as one for "a data decompressed video image input circuit generating data decompressed video image information"). *See, e.g.,* J.A. 11599–601. The Board also reversed one rejection because it was based on language not appearing in the claims (the "weight" limitations). J.A. 11602–03. For the other eight groups of claim limitations at issue, however, the Board agreed with the examiner that these limitations (such as "generating two dimensional processed image information in response to the accessed blocks of pixel image information and in response to the two dimensional vector information") were not supported by adequate written description, and explained its reasoning in detail. *See, e.g.,* J.A. 11604–06. The Board also reversed the rejections on the grounds of obviousness, anticipation, and double patenting, which are not at issue in this appeal. J.A. 11638.

Hyatt filed a request for rehearing with the Board on September 30, 2002. J.A. 11642. In the brief supporting his request, he provided extensive new arguments and citations to the specification purportedly detailing where disputed limitations of each still-rejected claim derive written description support and are enabled. J.A. 11642–792. The Board denied his request for rehearing, holding that these new arguments and citations could and should have been presented during the original appeal briefing. J.A. 11805–07.

## C. The § 145 Action

On April 16, 2003, Hyatt, now acting through counsel, filed a district court action under 35 U.S.C. § 145 against the Director. The Director filed a motion for summary judgment, arguing principally that the Board's decision to reject all of the relevant claims of the '702 application for lack of written description and enablement was supported by substantial evidence. Hyatt opposed the motion, proffering his own declaration as well as his briefing from his request for rehearing before the Board (collectively, "Hyatt declaration") as purported evidence supporting his opposition and precluding summary judgment in favor of the Director. The Director objected to the Hyatt declaration on the ground that Hyatt failed to timely submit it before the Board. *Hyatt v. Dudas*, 2005 WL 5569663, at **4, 6 n. 11 (D.D.C. Sept. 30, 2005) (*"Hyatt II"*). Hyatt submitted no other evidence.

The district court excluded the Hyatt declaration because it found Hyatt had been "negligent" in failing to submit it to the PTO during examination or in a timely manner to the Board on appeal. *Id.* at *4–7. The district court then proceeded to analyze the record before the Board and concluded that the Board's decision to uphold the written description rejections was supported by substantial evidence. *Id.* at *7–10. As the court found that no genuine issues of material fact had been raised, it granted summary judgment to the Director that Hyatt's claims were invalid for failure to meet the written description requirement (and considered the enablement issue moot). *Id.* at *10. The district court denied Hyatt's subsequent motion for reconsideration. *Hyatt v. Dudas*, 2006 WL 4606037 (D.D.C. Sept.30, 2006).

Hyatt then timely appealed the district court's judgment to this court. We stayed this appeal pending the decision in a related appeal, *Hyatt v. Dudas*, 492 F.3d 1365 (Fed.Cir.2007) (*"Hyatt I"*). We have jurisdiction under 28 U.S.C. § 1295(a)(4)(C).

## II.

The central issue in this appeal is whether the district court properly excluded the Hyatt declaration. The parties argue whether, in light of over a century of precedent and practice involving trial court actions to overturn Patent Office decisions, the district court properly excluded Hyatt's declaration. The parties are correct that this court has never squarely addressed the issue of exactly what standard governs district courts in ruling on the admissibility of evidence withheld during examination in the PTO. Hyatt argues that a plaintiff in a § 145 action is " 'entitled' to submit additional evidence" subject to no limitations other than those imposed by the Federal Rules of Evidence. [Blue br. at 11–12]. The Director counters that Congress could not have intended district courts in § 145 actions to disregard the proceedings before the PTO altogether. The Director urges that § 145 actions are at least partly a form of appeal of PTO decisions, and that evidence not submitted to the PTO through the negligence, or at least the gross negligence, of the applicant is properly excluded in a § 145 action.

Section 145 is silent regarding what evidence—or whether any new evidence—can be admitted in such an action. Nor does the statute expressly indicate what, if any, deference the district court must give to the findings of the Board, or our court to the rulings of the district court. As background, we will trace the origins of § 145[3] and summarize the historical practice of

---

**3.** Which, according to the Supreme Court, "cannot be stated briefly." *Hoover Co. v. Coe,* 325 U.S. 79, 84, 65 S.Ct. 955, 89 L.Ed. 1488 (1945) (discussing origins of R.S. § 4915).

excluding certain evidence an applicant did not present to the Patent Office. We will also discuss one issue the parties did not, the Administrative Procedure Act ("APA").

## A.

### 1.

Shortly after the founding of the United States, Congress, pursuant to its constitutional power to "promote the Progress of Science and useful Arts," U.S. Const. art. I, § 8, cl. 8, passed its first patent act. Act of Apr. 10, 1790, ch. 7, 1 Stat. 109–12. Under this statute, a majority of "the Secretary of State, the Secretary for the department of war, and the Attorney General" had the power to allow a patent application. *Id.* § 1. Congress did not provide for judicial review of the decision to reject a patent application. Three years later, Congress abolished the examination of patents, and for the next three decades, the United States operated under a regime of patent registration. *See* Act of Feb. 21, 1793, ch. 1, § 1, 1 Stat. 318; P.J. Federico, *Evolution of Patent Office Appeals* (pts. 1 & 2), 22 J. Pat. Off. Soc'y 838 (1940), 22 J. Pat. Off. Soc'y 920 (1940), at 838.

In 1836, Congress created the Patent Office and the post of Commissioner of Patents. Act of July 4, 1836, ch. 357, § 1, 5 Stat. 117. The Commissioner and his staff of seven were responsible for determining if patent applications disclosed sufficiently useful, important, and novel alleged inventions to warrant a patent. *See id.* §§ 2, 7. An applicant dissatisfied with the Commissioner's decision could appeal to a "board of examiners" appointed by the Secretary of State; at least one board member was "to be selected, if practicable and convenient, for his knowledge and skill in the particular art, manufacture, or branch of science to which the alleged invention appertains." *Id.* § 7. Congress

also created a process whereby an applicant could challenge the decision of the board of examiners in court, although this was limited to situations involving overlap between patents or between a patent and a patent application:

> [W]henever there shall be two interfering patents, or whenever a patent on application shall have been refused on an adverse decision of a board of examiners, on the ground that the patent applied for would interfere with an unexpired patent previously granted, any person interested in any such patent, either by assignment or otherwise, in the one case, and any such applicant in the other case, *may have remedy by bill in equity;* and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge and declare either the patents void in the whole or in part, or inoperative and invalid in any particular part or portion of the United States, according to the interest which the parties to such suit may possess in the patent or the inventions patented, and may also adjudge that such applicant is entitled, according to the principles and provisions of this act, to have and receive a patent for his invention, as specified in his claim, or for any part thereof, as the fact of priority of right or invention shall in any such case be made to appear. And such adjudication, if it be in favor of the right of such applicant, shall authorize the Commissioner to issue such patent, on his filing a copy of the adjudication, and otherwise complying with the requisitions of this act. Provided, however, That no such judgment or adjudication shall affect the rights of any person except the parties to the action and those deriving title from or under them subsequent to the rendition of such judgment.

*Id.* § 17 (emphasis added and removed). Congress additionally provided for federal

jurisdiction over such actions with no restrictions on venue: "[A]ll actions, suits, controversies, and cases arising under any law of the United States, granting or confirming to inventors the exclusive right to their inventions or discoveries, shall be originally cognizable, as well in equity as at law, by the circuit courts of the United States, or any district court having the powers and jurisdiction of a circuit court." *Id.* § 18.

Over the next several decades, minor changes were made to the process of contesting an adverse decision of the Commissioner. In 1839, Congress specified that instead of to a board of examiners, appeals from a decision of the Commissioner would be taken "to the chief justice of the district court of the United States for the District of Columbia." Act of Mar. 3, 1839, ch. 88, § 11, 5 Stat 355. Several years later, Congress instead directed appeals to any one of the judges of "the Circuit Court of the District of Columbia." [4] Act of Aug. 30, 1852, ch. 107, § 1, 10 Stat. 75. During the Civil War, Congress abolished the District of Columbia district and circuit courts and assigned all their functions to the newly-created "supreme court for the District of Columbia." Act of Mar. 3, 1863, ch. 91, §§ 1, 3, 12 Stat 762–63. None of these changes affected the procedure of the 1836 act for a bill in equity, which remained available after *some* court of the District of Columbia had reviewed the Commissioner's decision. *See Potter v. Dixon,* 19 F. Cas. 1145, 1146 (C.C.S.D.N.Y.1863) (No. 11,325).

Congress substantially revised the patent laws in 1870. *See* Act of July 8, 1870, ch. 230, 16 Stat. 198–217. Primary responsibility for examining an application was vested in a "primary examiner;" Congress also authorized a single "examiner in charge of interferences." *Id.* §§ 4, 46. The decision of either could be appealed "to the board of examiners-in-chief," and from there to the Commissioner.[5] *Id.* §§ 46–47. Further appeal could be taken "to the supreme court of the District of Columbia, sitting in banc;" the appeal was to be decided "on the evidence produced before the commissioner." *Id.* §§ 48–50. The decision of the District of Columbia supreme court could be challenged via a bill in equity:

> *[W]henever a patent on application is refused, for any reason whatever, either by the commissioner or by the supreme court of the District of Columbia upon appeal from the commissioner, the applicant may have remedy by bill in equity;* and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear. And such adjudication, if it be in favor of the right of the applicant, shall authorize the commissioner to issue such patent, on the applicant filing in the patent office a copy of the adjudication, and otherwise complying with the requisitions of law. And *in all cases where there is no opposing party a copy of the bill shall be served on the commissioner, and all the expenses of the proceeding shall be paid by the applicant, whether the final decision is in his favor or not.*

*Id.* § 52 (later codified as R.S. § 4915) (emphasis added).[6] Unlike the procedure

---

4. The District of Columbia district and circuit courts were both staffed by the same three judges. Federico at 850–52.

5. These statutory changes merely formalized the practice that had developed over time within the Patent Office. Federico at 853–56.

6. Although the statute provided a bill in equity could be filed after an adverse decision

under the 1836 act, the 1870 act allowed a bill in equity for any refusal to allow a patent application, not just a refusal based on an interfering patent.[7]

In 1893, Congress created "the court of appeals of the District of Columbia," which had general appellate supervision of the supreme court of the District of Columbia. Act of Feb. 9, 1893, ch. 74, §§ 1, 7, 27 Stat. 434–35. To this new court were also assigned appeals from decisions of the Commissioner. *Id.* § 9. While appeals from "final judgments" of the court of appeals of the District of Columbia could be taken to the Supreme Court, *id.* § 8, the Supreme Court held that it lacked jurisdiction to review a decision of the Court of Appeals of the District of Columbia affirming the Commissioner's rejection of an application because "the decision of that court may be challenged generally and a refusal of patent may be reviewed and contested by bill as provided" for by Revised Statutes § 4915. *Frasch v. Moore,* 211 U.S. 1, 9, 29 S.Ct. 6, 53 L.Ed. 65 (1908).

Although this created an appellate path from the Patent Office that may seem highly unusual to us today, such a path was used. *See Uihlein v. Gen. Elec. Co.,* 47 F.2d 997, 998 (7th Cir.1931) (appeal from examiner of interferences, to board of examiners-in-chief, to Commissioner, to D.C.Cir., to E.D. Wis., to 7th Cir.); *Courson v. O'Connor,* 227 F. 890, 890, 892 (7th Cir.1915) (appeal from examiner of interferences, to board of examiners-in-chief, to Commissioner, to D.C.Cir., to N.D. Ill., to 7th Cir.). It also seemed unusual to many at the time; in Congressional hearings and reports leading up to the 1927 amendments to the Patent Act, the fact that in no other area of law were "five appeals" possible was often mentioned. *See, e.g., Procedure in the Patent Office: Hearing on H.R. 7563 and H.R. 13487 before the H. Comm. on Pats.* ("H.R. 7563 Hearing"), 69th Cong. 8 (Dec. 10, 1926) (statement of A.C. Paul, Chairman of Legislation Comm., Pat. Section, of the Am. Bar Ass'n); *Procedure in the Patent Office: Hearing on S. 4812 before the S. Comm. on Pats.* ("S. 4812 Hearing"), 69th Cong. 8 (Dec. 20, 1926) (statement of Thomas E. Robertson, Comm'r of Pats.); H.R.Rep. No. 69–1889, at 1, 2, 7 (Jan. 28, 1927).[8]

In 1927, Congress significantly altered the process of reviewing rejections. A substantial motivation for doing so was the unusual and lengthy process involving "five appeals" for patent applicants. *See id.* To streamline the appeal process, various groups suggested eliminating the bill in equity or the direct appeal from the Patent Office; Congress settled on retaining both

"either by the commissioner or by the supreme court of the District of Columbia upon appeal from the commissioner," the statute was nonetheless interpreted as allowing a bill in equity to be filed only after an adverse decision of the supreme court of the District of Columbia. *See Kirk v. Comm'r of Pats.,* 5 Mackey 229, 1886 WL 15875, *2 (D.C.Sup. 1886).

7. The rules of equity practice applied to suits under Revised Statutes § 4915. *See Appleton v. Ecaubert,* 45 F. 281, 282 (C.C.E.D.N.Y. 1891).

8. While Revised Statutes § 4915 did not on its face limit the venues in which a dissatisfied applicant could file a bill in equity, the practice of the Commissioner sometimes did. *See S. 4812 Hearing* at 8 (Robertson) ("If it is an ex parte case, the statute requires that service must be made on the Commissioner of Patents, and the Commissioner of Patents will not accept service in these suits all over the Untied States. The Department of Justice has not thought it proper to do that, so the commissioner will accept service only in the District of Columbia, or in Baltimore, nearby.... When I came in as commissioner five years ago we had one in Texas, and, of course, it makes it very difficult for the department to handle.").

procedures but forcing applicants to elect one or the other. *Hoover Co. v. Coe,* 325 U.S. 79, 83, 65 S.Ct. 955, 89 L.Ed. 1488 (1945); *S. 4812 Hearing* at 10 (Paul). Defenders of the bill in equity primarily argued for it by pointing out that it was the only method for supporting a patent application with live testimony. *See, e.g., H.R. 7563 Hearing* at 11, 15 (Robertson); *S. 4812 Hearing* at 15 (statement of Edward S. Rogers). Congress additionally simplified the appeal process by combining the two appeals within the Patent Office (to the board of examiners-in-chief and then to the Commissioner) into one (to a three-member "board of appeals" constituted from "the Commissioner of Patents, the first assistant commissioner, the assistant commissioner, and the examiners in chief"). Act of Mar. 2, 1927, ch. 273, §§ 3–9, 44 Stat. 1335–36.

Because of a backlog in the Court of Appeals of the District of Columbia, in 1929, Congress renamed the "Court of Customs Appeals" the "Court of Customs and Patent Appeals," and redirected appeals from the Patent Office to the renamed court. Act of Mar. 2, 1929, ch. 488, 23 Stat. 1475–76; *S. 4812 Hearing* at 25–27 (statement of Karl Fenning, Chairman, Comm. on Laws & Rules of the Am. Pat. Law Ass'n).[9]

Congress significantly reworked the Patent Act in 1952. Revised Statutes § 4915 was bifurcated into separate provisions: 35 U.S.C. § 145 for ex parte proceedings, and 35 U.S.C. § 146 for interference proceedings. Congress made clear that this was not meant to change the substantive application of Revised Statutes § 4915. *See* S.Rep. No. 82–1979 (1952), *as reprinted in* 1952 U.S.C.C.A.N. 2394, 2400. ("This group of sections makes no fundamental change in the various appeals and

other review of Patent Office action, but has made a few changes in the procedure in various instances to correct some of the problems which have arisen, particularly in section 146. These details are mainly procedural."). Subsequent changes to § 145 have been mainly cosmetic; § 145 currently reads (much as it did in 1952):

> An applicant dissatisfied with the decision of the Board of Patent Appeals and Interferences in an appeal under [35 U.S.C. § 134(a)] may, unless appeal has been taken to the United States Court of Appeals for the Federal Circuit [under 35 U.S.C. § 141], have remedy by civil action against the Director in the United States District Court for the District of Columbia if commenced within such time after such decision, not less than sixty days, as the Director appoints. The court may adjudge that such applicant is entitled to receive a patent for his invention, as specified in any of his claims involved in the decision of the Board of Patent Appeals and Interferences, as the facts in the case may appear and such adjudication shall authorize the Director to issue such patent on compliance with the requirements of law. All the expenses of the proceedings shall be paid by the applicant.

### 2.

Under Revised Statutes § 4915 as it existed from 1927 to 1952, differences existed between the procedure for bills in equity based on ex parte proceedings and those based on interferences; as enacted in 1927, the last three sentences read:

> *In all cases where there is no opposing party a copy of the bill shall be served on the commissioner; and all the expenses of the proceedings shall be paid*

---

9. Prior to this change, Chief Justice William Howard Taft had been regularly reassigning judges from the Court of Customs Appeals to

the Court of Appeals of the District of Columbia to help relieve the latter court's congestion. *S. 4812 Hearing* at 25–27.

*by the applicant, whether the final decision is in his favor or not.* In all suits brought hereunder *where there are adverse parties* the record in the Patent Office shall be admitted in whole or in part, on motion of either party, subject to such terms and conditions as to costs, expenses, and *further cross-examination of the witnesses as the court may impose, without prejudice, however, to the right of the parties to take further testimony. The testimony and exhibits, or parts thereof, of the record in the Patent Office when admitted shall have the same force and effect as if originally taken and produced in the suit.*

(emphasis added). The first of these sentences is the basis for the last sentence of the current version of § 145: "All the expenses of the proceedings shall be paid by the applicant." The last two sentences of Revised Statutes § 4915 appear in revised form in the current version of § 146:

> In such suits the record in the Patent and Trademark Office shall be admitted on motion of either party upon the terms and conditions as to costs, expenses, and the *further cross-examination of the witnesses as the court imposes, without prejudice to the right of the parties to take further testimony. The testimony and exhibits of the record in the Patent and Trademark Office when admitted shall have the same effect as if originally taken and produced in the suit.*

(emphasis added). Congress added these last two sentences to Revised Statutes § 4915 in 1927 to eliminate an inefficient practice that had previously been required in interferences. As the Third Circuit explained, under Revised States § 4915 prior to the 1927 amendment,

> the evidence given in the interference proceedings could be introduced only as secondary evidence, after proper foundation laid. The competency of such evidence had to be determined according to the principles of equity jurisprudence. In other words, the witnesses who had testified in the interference proceedings had to testify anew in the suit in the district court. If they did not so testify their absence had to be accounted for in the usual way if the testimony taken in the interference was to be received as secondary evidence. The [1927] amendment was passed to avoid this arduous and expensive means of reproducing the evidence of the interference proceedings in the suit.

*Gen. Talking Pictures Corp. v. Am. Tri-Ergon Corp.,* 96 F.2d 800, 812 (3d Cir. 1938).

To the extent that pre–1927 interferences cases could be read to support a de novo review standard, these cases are based on the prior practice of affording the Patent Office record little weight. For example, in *Ex parte Squire* (which was cited in *Hoe,* 112 U.S. at 61, 5 S.Ct. 25) the court explained that "[t]he evidence before the commissioner is not evidence here, except by consent of parties. It is taken, generally, without much regard to formality, and is ex parte, and, even if permitted to be used here, not entitled to the credit of proof taken in the usual way." 22 F.Cas. at 1016–17. In amending Revised Statutes § 4915 in 1927, Congress clearly rejected this approach.

Because both § 145 and § 146 are derived from Revised Statutes § 4915, and we have previously described them as "parallel provisions," *Winner Int'l Royalty Corp. v. Wang,* 202 F.3d 1340, 1345 (Fed. Cir.2000), our precedent from § 146 cases can be used for guidance in interpreting § 145. We have noted that while § 146 prescribes a method for introducing the PTO record in a § 146 action, "section 145 is completely silent about evidence." *Winner,* 202 F.3d at 1345.

However, as explained in *General Talking Pictures*, Congress provided in § 146 this method of admitting the Patent Office record and required that it "shall have the same effect as if originally taken and produced in the suit" to overcome a specific problem that existed only in bills in equity based on interferences, not those based on ex parte prosecution. The absence of similar language in § 145 does not suggest that the PTO record should be given less weight in a § 145 action. *But see Fregeau v. Mossinghoff*, 776 F.2d 1034, 1041–42 (Fed.Cir.1985) (Newman, J., concurring in part) (asserting § 145's silence about evidence means that § 145 proceedings should be conducted without regard to PTO record). Indeed, as we discuss below, it was well established by the Supreme Court that review of agency decisions was generally on the agency record. It should also be kept in mind that there are differences between ex parte prosecution and interference practice before the PTO, such as that live testimony may in certain circumstances be taken in interferences but not ex parte prosecution, *see* Trial Division of the Board of Patent Appeals and Interferences Standing Order at 1, http://www.uspto.gov/go/dcom/bpai/Standing-Order.pdf; *Ginter v. Benson*, 81 U.S.P.Q.2d 1342, 1349 (B.P.A.I.2005).

### 3.

■ While the Federal Circuit has not delineated a standard under which evidence may be excluded in § 145 actions,[10] various other courts have. Issues specific to § 145 actions are a matter of Federal Circuit, rather than regional circuit, law. *Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 779 (Fed.Cir.1985). So far,

we have left open the extent to which we should adopt the § 145 precedents from other circuits. *Id.* We thus undertake a review of past decisions of other courts.

Under the pre–1927 version of the statute, the Supreme Court made clear that a bill in equity under Revised Statutes § 4915 was not independent of proceedings in the Patent Office. Instead, the Court described this bill in equity as

> something more than a mere appeal. It is an application to the court to set aside the action of one of the executive departments of the government. The one charged with the administration of the patent system had finished its investigations and made its determination with respect to the question of priority of invention. That determination gave to the defendant the exclusive rights of a patentee. A new proceedings is instituted in the courts,—a proceeding to set aside the conclusions reached by the administrative department, and to give to the plaintiff the rights there awarded to the defendant. *It is something in the nature of a suit to set aside a judgment, and, as such, is not to be sustained by a mere preponderance of evidence.*

*Morgan v. Daniels*, 153 U.S. 120, 124, 14 S.Ct. 772, 38 L.Ed. 657 (1894) (emphasis added). Although dealing with the burden of proof and not admissibility of evidence, *Morgan* makes clear that the proceedings before the Patent Office could not be disregarded in court proceedings. The Supreme Court had also explained that under Revised Statutes § 4915, an applicant could file a

---

**10.** The dissent presents several of cases in which this court has considered new evidence in § 145 and § 146 cases without analyzing whether that evidence should have been presented to the PTO. Dissent at 1284–85. In none of the cases the dissent cites, however, did any party object to the evidence. This court does not engage in sua sponte review of evidentiary rulings; objections not raised before the district court are ordinarily considered waived. *Caterpillar Inc. v. Sturman Indus.*, 387 F.3d 1358, 1368 (Fed.Cir.2004).

bill in equity. This mean[t] a proceeding in a court of the United States having original equity jurisdiction under the patent laws, according to the ordinary course of equity practice and procedure. It [wa]s not a technical appeal from the patent-office, like that authorized in section 4911, confined to the case as made in the record of that office, but [wa]s prepared and heard upon all competent evidence adduced, and upon the whole merits.

*Butterworth v. United States ex rel Hoe,* 112 U.S. 50, 61, 5 S.Ct. 25, 28 L.Ed. 656 (1884);[11] *see also Hoover Co. v. Coe,* 325 U.S. 79, 83, 65 S.Ct. 955, 89 L.Ed. 1488 (1945) (Under R.S. § 4915, "a formal trial is afforded on proof which may include evidence not presented in the Patent Office."); *In re Hien,* 166 U.S. 432, 439, 17 S.Ct. 624, 41 L.Ed. 1066 (1897) ("The bill in equity provided for by section 4915 is wholly different from the proceeding by appeal from the decision of the commissioner.... The one is in the exercise of original, the other of appellate, jurisdiction."). More recently, the Court has also, "in passing, noted the settled law that in a section 145 action a disappointed applicant may present evidence that it did not present to the Board, and that the 'presence of such *new* or *different* evidence makes a factfinder of the district judge.'" *Winner,* 202 F.3d at 1345–46 (quoting *Dickinson v. Zurko,* 527 U.S. 150, 164, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)) (emphasis added in *Winner*).

The dissent states that our holding is "in conflict with Supreme Court jurisprudence on this point." Dissent at 1282. In fact, the Supreme Court has never decided the issue of what kind of evidence or when evidence could be introduced in § 145 or Revised Statutes § 4915 actions, and there is no clear guidance to be gleaned from Supreme Court jurisprudence. The dissent fails to recognize that Hoe involved not a bill in equity under Revised Statutes § 4915 but rather a writ of mandamus; the issue was "whether the secretary of the interior had power by law to revise and reverse the action of the commissioner of patents" in an interference. 112 U.S. at 54, 5 S.Ct. 25. As quoted above, the Court in Hoe noted that a suit under Revised Statutes § 4915 was "prepared and heard upon all competent evidence adduced," but remained silent as to what was "competent evidence" under Revised Statutes § 4915.[12] The dissent erroneously presents these phrases from *Hoe* as a holding. Dissent at 9. The dissent's reading of *Hoe,* however, is contrary to the Supreme Court's:

Although, as was said by this court in [*Hoe* ], the proceeding by bill in equity, under section 4915, on the refusal to grant an application for a patent, intends a suit according to the ordinary course of equity practice and procedure, and is not a technical appeal from the patent-office, nor confined to the case as made in the record of that office, but is prepared and heard upon all competent evidence adduced, and upon the whole merits, *yet the proceeding is, in fact and necessarily, a part of the application for the patent.*

*Gandy v. Marble,* 122 U.S. 432, 439, 7 S.Ct. 1290, 30 L.Ed. 1223 (1887) (emphasis added; citations omitted); *see also Hien,* 166 U.S. at 434, 17 S.Ct. at 626 (in explaining *Gandy,* noting that "the bill in equity was sub modo a branch of the application for the patent").

**11.** The dissent misrepresents the import of an isolated phrase from this quotation. *See* Dissent at 1283.

**12.** Competent evidence is a synonym for admissible evidence. Bryan A. Garner, *A Dic-* *tionary of Modern Legal Usage* 186 (1995 2d ed.).

None of the other Supreme Court cases the dissent relies upon addressed this question either, or even involved suits under § 145 or Revised Statutes § 4915. The issue in *Zurko* (which involved an appeal under § 141 rather than an action under § 145) was whether the standard of review set forth in the APA "applies when the Federal Circuit reviews findings of fact made by the Patent and Trademark Office." [13] 527 U.S. at 152, 119 S.Ct. 1816. In *Hien*, which involved an appeal under Revised Statutes § 4911 rather than a bill in equity under Revised Statutes § 4915, the Court decided whether the two-year time limit for an applicant to respond to actions of the Patent Office required that an applicant be allowed two years to file a notice of appeal with the court of appeals for the District of Columbia. 166 U.S. at 436, 17 S.Ct. 624.

To be sure, the Supreme Court cases establish that in some circumstances new evidence may be submitted. But merely because new evidence *may* be submitted does not necessarily mean this right is unfettered;[14] there still may be situations in which new evidence *may* be excluded. Over the last century, lower federal courts have found circumstances in which the actions of a party before the Patent Office justify excluding evidence offered by that party from a suit to obtain a patent.

In an opinion from 1896, the Sixth Circuit, although not excluding evidence out-right, stated "that its evidential weight is much impaired from the fact that, though accessible, it was not introduced during the interference proceedings." *Standard Cartridge Co. v. Peters Cartridge Co.*, 77 F. 630, 638 (6th Cir.1896).

In *Western Electric Co. v. Fowler*, a party to an interference, Fowler, argued for and submitted evidence supporting a June 1901 date of reduction to practice, and, after the examiner of interferences awarded priority to his opponent in the interference, Fowler attempted to submit new evidence supporting a March 1901 reduction to practice. 177 F. 224, 226 (7th Cir.1910). This new evidence was admitted, but the examiner of interferences held Fowler to his original argument. *Id.* Fowler appealed successively to the examiner in chief, the Commissioner, and the Court of Appeals for the District of Columbia, but the decision of the examiner of interferences was affirmed each time. *Id.* Fowler filed a bill in equity to obtain a patent, and the Circuit Court for the Northern District of Illinois found for Fowler. *Id.* at 224. On appeal, the Seventh Circuit discounted the evidence Fowler produced tardily in the Patent Office, and on that basis, reversed the district court. *Id.* at 228–29; *see also Courson v. O'Connor*, 227 F. 890, 892–93 (7th Cir. 1915) (allowing new testimony in the circumstance of that case).

---

**13.** It is ironic that the dissent downplays the importance of the holding of *Zurko* (and criticizes the fact that we even discuss the APA), *see* Dissent at 12 n. 4, and instead fixates on the statement that § 145 "permits the disappointed applicant to present to the court evidence that the applicant did not present to the PTO" (which was part of a rejection of the Federal Circuit's rationale for holding that the APA did not apply to appeals under § 141). *See Zurko*, 527 U.S. at 164, 119 S.Ct. 1816. Of course new evidence is "permit[ted]", but this does not mandate the admission of all evidence whatsoever. If this statement were as absolute as the dissent believes, it would seemingly trump the Federal Rules of Evidence.

**14.** The dissent overlooks this distinction. *See* Dissent at 1281–85. Neither *Ex parte Squire*, 22 F. Cas. 1015, 1017 (C.C.E.D.Mo.1877) (No. 13,269), nor *Butler v. Shaw*, 21 F. 321, 326 (C.C.D.Mass.1884), support the dissent's argument that the right to admit new evidence is wholly unconstrained; each merely recites the unremarkable proposition that new evidence *may* have been submitted in a suit under Revised Statutes § 4915.

The court in *General Electric Co. v. Steinberger* took a limited view of what new evidence could be disregarded:

> In some instances the new testimony is offered as to matters which were not thought relevant or necessary for presentation to the Patent Office in the previous hearing.
>
> In general it must be held that all such testimony is competent and must be considered by the court in the action under section 4915, but in so far as the conclusions of the Patent Office, as sustained on appeal, are treated as a fair determination, upon similar testimony, and hence as being valid unless plainly erroneous, and in so far as the parties to the interference proceeding may have been estopped from asserting things inconsistent with their claims before the Patent Office, this court will not use the additional proofs in reaching a conclusion on the right to the patent, until it has determined whether the defeated party is in a position to contest further, or to give additional testimony about, the matters thus previously determined.

208 F. 699, 701 (E.D.N.Y.1913).

After the 1927 amendments to the Patent Act, no circuit court allowed a de novo trial in an action under Revised Statutes § 4915. One of the more influential cases on the admissibility of evidence is *Barrett Co. v. Koppers Co.*, 22 F.2d 395 (3d Cir. 1927). There, during interference proceedings in the Patent Office, the Barrett Company instructed its employees not to answer questions about certain of its "commercial practices." *Id.* at 396. The Barrett Company lost the interference, and then filed a bill in equity under Revised Statutes § 4915 and sought to introduce before the district court the exact testimony it had instructed its employees not to provide during the interference. *Id.* The Third Circuit found that the district court properly excluded this evidence, saying:

> The law gave the plaintiffs a day in court on the issue of priority. That was the day the interference was heard and if they chose not to avail themselves of their full rights but to gamble on the decision by giving only a part, and the weaker part, of the evidence they had in hand, they did it at their own risk. After losing on such evidence in what otherwise would be a train of futile appeals in the patent tribunals and Court of Appeals of the District of Columbia they cannot come into a District Court and say, now for the first time we shall tell the true story of reduction to practice and demand a patent.
>
> .... *When, as in this case, a party has refused to produce evidence for consideration by the Court of Appeals of the District of produces that very evidence to overcome the effect of that court's decision, he comes very close to trifling with the courts' processes.* If in this case the Court of Appeals of the District of Columbia was wrong it was because the plaintiffs purposely kept it in the dark. If now this court were in effect to reverse the decision of that court on evidence brought to light for the first time, we should be assisting the plaintiffs to profit by their own technical wrong doing.
>
> .... Particularly are we anxious that no one should think that we hold that any evidence not before the Court of Appeals of the District of Columbia is inadmissible in an action under section 4915, R.S. Such a notion would destroy the action given by section 4915, R.S. and throw overboard the whole doctrine of *Morgan v. Daniels.* Specifically our decision is that the plaintiffs in this action under section 4915, R.S., are *estopped to offer evidence which was wholly within their possession and control at the interference proceeding* and which they withheld from that proceeding and,

therefore, withheld from the other patent tribunals and the Court of Appeals of the District of Columbia, and thereby made it impossible for those tribunals and that court to render what they, the plaintiffs, now maintain is the right decision.

*Id.* at 397 (formatting altered; emphasis added); *see also Standard Oil Co. v. Montedison, S.p.A.*, 540 F.2d 611, 616 (3d Cir.1976) ("An action brought under § 146" is "limited to the review of a decision of the Board of Patent Interferences.").

While the Third Circuit gave *Barrett* a fairly limited reading in a subsequent case,[15] other courts have interpreted *Barrett* more broadly. The Eighth Circuit cited *Barrett* when affirming a district court's exclusion of evidence that could have been presented to the Patent Office but was not. *Kirschke v. Lamar*, 426 F.2d 870, 872–75 (8th Cir.1970). The District of Massachusetts followed *Barrett* in *O'Donnell v. United Shoe Machinery Corp.*, 2 F.Supp. 178, 181 (1933). There, the plaintiff presented witnesses to the Patent Office, but they did not testify about an experiment the plaintiff had allegedly performed. *Id.* After losing the interference, the plaintiff instituted a suit under Revised Statutes § 4915, and sought to have the same witnesses testify about the alleged experiment. *Id.* The defendant objected to this new evidence, and the court disallowed it, saying:

All of the additional testimony was available when the question of priority was before the Patent Office....

I am not inclined to sanction the practice of submitting issues of fact to an administrative department, competent to decide the issue, upon a partial presentation of the available evidence, reserving the full presentation for a trial in the courts to set aside the order of the administrative authority. This practice was justly condemned in *Barrett Co. v. Koppers Co.* ...

*Id.*

The Eastern District of New York promulgated a novel formulation of the rule of *Barrett*, namely that evidence available to but not presented by the party who lost before the Patent Office would be given "no weight" because the losing party gave "no sufficient reason" why the evidence was not presented to the Patent Office. *Perkins v. Lawrence Sperry Aircraft Co.*, 57 F.2d 719, 720–21 (E.D.N.Y.1932). Conversely, the court also ruled that the party successful before the patent office was "not bound by" this rule. *Id.* However, Judge Learned Hand, writing for the Second Circuit, hinted his disapproval of such a stringent exclusion standard the following year:

In *Barrett Co. v. Koppers*, the Third Circuit refused to consider evidence which the inventor had *deliberately suppressed* in the interference, and used broader language than the exact situa-

---

**15.** *See Minn. Mining & Mfg. Co. v. Carborundum*, 155 F.2d 746, 748 (3d Cir.1946) (distinguishing *Barrett* and affirming district court's denial of motion to exclude expert testimony which was allegedly "available to the plaintiffs at the time of the proceedings in the Patent Office" because the evidence was not *intentionally suppressed* ). In a subsequent, related appeal of *Standard Oil*, the Third Circuit rejected the argument that the district court should have required a party to explain why it was only offering evidence for the first time before the district court. *Standard Oil Co. (Ind.) v. Montedison, S.P.A.*, 664 F.2d 356, 376 (3d Cir.1981) ("[N]ew expert testimony is clearly admissible in a section 146 action without such justification to the extent that it aids the court in understanding issues already presented to the Board."). It is not clear from the opinion, however, that the objecting party did anything other than attempt to place the burden of justifying the evidence on the party offering it.

tion required, which we quoted with approval in *Greene v. Beidler,* 58 F.2d 207, 209–10 (2d Cir.1932). However, it does not follow that it would have extended the doctrine to evidence not *suppressed,* but merely *neglected* through the plaintiff's slackness in preparation. *Perkins v. Lawrence Sperry Aircraft Co.* did so extend it, but we need not approve. The question is doubtful and we prefer to leave it open, for it is not necessary to answer it here.

*Dowling v. Jones,* 67 F.2d 537, 538 (2d Cir.1933) (citations altered and omitted; formatting altered; emphasis added).[16]

The Seventh Circuit likewise accepted that evidence could be excluded from a case brought under Revised Statutes § 4915 because of the actions of a patent applicant:

> In the *Barrett* case, *the additional evidence was at all times "wholly within (the) possession and control"* of plaintiff, but he had "withheld" the evidence from the Patent Office. Under such circumstances, *it is reasonable that the withholding person be estopped to present that evidence later.* Such a principle of estoppel works properly in many instances, e.g., when evidence has been deliberately withheld or secreted, and when a story is completely changed on coming to court. *We do not dispute the soundness of the proposition that all pertinent evidence, actually available, should be submitted in the first instance.* To permit partial presentation

before the Patent Office is to sanction the destruction of administrative justice.

> But we are satisfied that the estoppel principle has its limitations. It should not be used to penalize an innocent party. *Nor should it exclude the presentation of evidence, which previously had not been procurable or which had become known after the interference proceedings.* Coming now to the instant case, we find that Stoekle did *not intentionally withhold* the evidence which he later produced in court.... It seems undisputable that evidence may be available and existent at a given time, and yet not be within the knowledge or "possession and control" of the person desiring to make use of it. We are not prepared to say that Stoekle did not exercise *due diligence* in procuring the evidence sooner than he did.

*Globe–Union v. Chicago Tel. Supply Co.,* 103 F.2d 722, 728 (7th Cir.1939) (formatting altered; emphasis added).

By the time of *Velsicol Chemical Corp. v. Monsanto Co.,* at least in the Seventh Circuit, the rule based on *Barrett* had developed into the following:

> [A]bsent special circumstances,[17] the proper question for the district court was whether the failure of the proponent of the additional evidence to uncover its existence earlier or to procure it for the interference proceeding occurred *in spite of the proponent's diligence in preparing his case before the Board.* We agree with the court in *Kirschke*

---

**16.** The Second Circuit had earlier approved of *Barrett. See Greene v. Beidler,* 58 F.2d 207, 209–10 (2d Cir.1932) (quoting *Barrett* for the proposition that parties "cannot come into a District Court and say, now for the first time we shall tell the true story of reduction to practice and demand a patent" and stating "This is substantially the position which the appellees here have taken. It cannot prevail.").

**17.** Examples of special circumstances might include an intervening change in the law, the presence of a new issue, or the admission of other new evidence deserving of a response or further elaboration. *See e.g., Douglas Aircraft Co. v. Mueller,* 107 U.S.App. D.C. 321, 277 F.2d 351 (1960).

that it makes no difference whether the failure to produce the evidence was "attended by reprehensible motives or not (or) whether it be for tactical or other reasons." 426 F.2d at 874. Moreover, we find that in terms of the policy of encouraging full disclosure it is not necessary that there have been an affirmative action or *decision to suppress the evidence; it is enough that a reasonably diligent preparation of the proponent's case before the Board would have led to the discovery of the existence of the evidence and its production.* Nor is it necessary that the evidence have been in the exclusive control and possession of the proponent, as long as it was procurable by him. Conversely, *a litigant who has been reasonably diligent in identifying and procuring evidence* for the interference proceeding *will not be precluded* from strengthening his presentation in the district court if new evidence should become available to him in the interim.

*Velsicol,* 579 F.2d 1038, 1046 & n. 10 (7th Cir.1978) (footnote renumbered; emphasis added).

The D.C. Circuit has stated that "the plaintiff may not submit for the first time evidence which he was negligent in failing to submit to the Patent Office." *Cal. Research Corp. v. Ladd,* 356 F.2d 813, 820 n. 18 (D.C.Cir.1966). The D.C. Circuit has also prohibited an applicant from raising new issues in a § 145 action, and justified that rule as a necessary extension of the requirement that one exhaust administrative remedies before resorting to court, *DeSeversky v. Brenner,* 424 F.2d 857, 859–60 (D.C.Cir.1970) (per curiam), or, as the D.C. Circuit has also explained it, a § 145 action "may not be conducted in disregard of the general policy of encouraging full disclosure to administrative tribunals," *Cal. Research,* 356 F.2d at 820 n. 18; *see also Knutson v. Gallsworthy,* 164 F.2d 497, 508–09 (D.C.Cir.1947). The D.C. Circuit has noted that "surprise should not materially affect the result in" § 145 cases. *Cal. Research,* 356 F.2d at 821.[18]

Under § 145, the District of Columbia district court is the exclusive forum for actions under that statute. Since 2002, there appear to have been approximately thirty § 145 actions filed in the District of Columbia district court.[19] Many are ter-

**18.** Although the D.C. Circuit did not expressly adopt *Barrett,* it cited the case to support a statement in dicta that evidence which was important and "readily available" yet not presented to the PTO should not be admitted in a suit under R.S. § 4915. *Boucher Inventions v. Sola Elec. Co.,* 131 F.2d 225, 227 & n. 5 (D.C.Cir.1942). *See also* Emerson Stringham, Patent Interference Equity Suits 83–84 (1930) (*"Barrett v. Koppers* takes the rather extreme position that a party who withholds, during the office interference, evidence then in his possession and control, is thereafter estopped to present that evidence in an equity suit.... Probably such a ruling would be made only if the court considered that the withholding during the office proceeding *constituted bad faith, amounting to, or approximating, 'unclean hands.'"*) (emphasis added).

**19.** *SD3, LLC v. Doll,* 08–cv–01242–RWR; *Aldor Solutions Corp. v. Dudas,* 08–cv–00897–ESH;

*Dome Patent L.P. v. Doll,* 07–cv–01695–PLF; *Hitachi Koki Co. v. Doll,* 07–cv–01504–ESH; *Novo Nordisk A/S v. Dudas,* 06–cv–01896–CKK; *Takeda Pharm. Co. v. Dudas,* 06–cv–01640–TFH; *Fullerene Int'l Corp. v. Dudas,* 06–cv–01451–RMU; *Innovatit Seafood Sys. v. Comm'r of Pats.,* 06–cv–00825–JR; *Innovatit Seafood Sys. v. Comm'r of Pats.,* 06–cv–00822–JR; *Hickman v. Dudas,* 05–cv–02426–RBW; *Hyatt v. Dudas,* 05–cv–02310–H HK; *Dieterich Stnd. Inc. v. Dudas,* 05–cv–02296–RBW; *Putman v. Dudas,* 05–cv–01796–LFO; *Hyatt v. Dudas,* 05–cv–00834–EGS; *Hyatt v. Dudas,* 05–cv–00310–HHK; *Hyatt v. Dudas,* 05–cv–00309–EGS; *Galbreath v. Dudas,* 04–cv–02222–JR; *Hyatt v. Dudas,* 04–cv–01802–HHK;

minated before the district court must rule on the admissibility of evidence not before the PTO. *See, e.g., Novo Nordisk A/S v. Dudas,* No. 06–cv–01896, slip op. at 2–3 (July 3, 2007) (dismissing case by consent of parties).

There is no uniform practice in the District of Columbia district court regarding the standard governing exclusion from § 145 actions of evidence that was not submitted during PTO proceedings. *See Hyatt II,* 2005 WL 5569663, at *4–7 (after Director's objection, excluding evidence because failure to submit it to PTO was "negligent"); *Hitachi Koki Co. v. Dudas,* 556 F.Supp.2d 41, 47 (D.D.C.2008) (flatly rejecting negligence standard of *Hyatt II* and admitting evidence over Director's objection because failure to present it was not due to *"fraud, bad faith, or gross negligence"* (emphasis added)); *Takeda Pharm. Co. v. Dudas,* 511 F.Supp.2d 81, 87 (D.D.C.2007) (admitting new evidence over Director's objection because failure to submit it to PTO was "not *negligent"* (emphasis added)); *Killian v. Watson,* 121 U.S.P.Q. 507, 509 (D.D.C.1958) (after Commissioner's objection, excluding new evidence on alternate grounds that failure to submit it to Patent Office was *"grossly negligent"* and that applicant gave no explanation for the failure (emphasis added)); *see also Shell Dev. Co. v. Pure Oil Co.,* 111 F.Supp. 197, 199 (D.D.C.1953) (in § 146 case, admitting evidence over objection because failure to submit it during interference was not *due to "any bad faith, suppression, or gross negligence"* (emphasis added)). However, as the preceding cases show, the District of Columbia district court will always exclude evidence that was not presented to the PTO due to bad faith or gross negligence and sometimes if the failure to present it was negligent.

■ In sum, it has been the general practice of federal courts for over eighty years in certain circumstances to exclude evidence which a party could and should have introduced before the Patent Office but did not despite an obligation to do so. Our own cases likewise have not adopted a de novo standard for trial. We have said that "[c]learly, the applicant does not start over to prosecute his application before the district court unfettered by what happened in the PTO." *Fregeau,* 776 F.2d at 1038. On the other hand, it is beyond question that in appropriate circumstances new evidence may be submitted to the district court in a § 145 action (subject, at least, to the Federal Rules of Evidence). *See Gould v. Quigg,* 822 F.2d 1074, 1079 (Fed. Cir.1987) ("[A]dditional evidence is permitted in a civil action under section 145, allowing the district court to make *de novo* fact findings."); *Newman v. Quigg,* 877 F.2d 1575, 1579 (Fed.Cir.1989) ("A district court action under 35 U.S.C. § 145 is a de novo determination of patentability. It is not limited to the record before the PTO."); Emerson Stringham, Patent Interference Equity Suits 5 (1930) ("The equity suit offers distinctive advantages in way of a fresh hearing and the presentation of testimony direct to the tribunal.").

### B.

As the Supreme Court has noted, "[o]ne purpose" of Congress in enacting the APA "was to introduce greater uniformity of

*Hyatt v. Dudas,* 04–cv–01496–EGS;
*Hyatt v. Dudas,* 04–cv–01222–EGS;
*Hyatt v. Dudas,* 04–cv–01139–HHK;
*Hyatt v. Dudas,* 04–cv–01138–HHK;
*Hyatt v. Rogan,* 03–cv–01375–EGS;
*Hyatt v. Rogan,* 03–cv–01283–EGS;
*Hyatt v. Rogan,* 03–cv–01280–EGS;

*Regents of Univ. of Cal. v. Rogan,* 03–cv–01133–RWR;
*Hyatt v. Dudas,* 03–cv–00901–H HK;
*Hyatt v. Dudas,* 03–cv–00108–EGS;
*Protechna, SA. v. Godici,* 02–cv–02524–RBW;
*Galbreath v. Dudas,* 02–cv–02354–JR.

procedure and standardization of administrative practice among the diverse agencies whose customs had departed widely from each other." *Wong Yang Sung v. McGrath,* 339 U.S. 33, 41, 70 S.Ct. 445, 94 L.Ed. 616 (1950), *superseded by statute,* Supplemental Appropriation Act of 1951, 64 Stat. 1048, as *recognized in Marcello v. Bonds* 349 U.S. 302, 311, 75 S.Ct. 757, 99 L.Ed. 1107 (1955). The Court explained that lightly finding exceptions to the APA would defeat its purpose. *Id.*

■ Court review (whether by a district court or a court of appeals) of an administrative agency decision is presumptively deferential under the APA. *See* 5 U.S.C. §§ 701–06. The usual rule is that judicial review of agency action should be on the agency record, regardless of whether the action is in the court of appeals or in district court. *See Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 375–78, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Chandler v. Roudebush,* 425 U.S. 840, 862, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976) ("[I]n the absence of specific statutory authorization, a de novo review is generally not to be presumed."); *Camp v. Pitts,* 411 U.S. 138, 141–42, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam) ("[T]he focal point for judicial review [by the district court] should be the administrative record already in existence, not some new record made initially in the reviewing court."); *see generally* Jacob Stein, et al., *Administrative Law* § 51.04 (2006).

■ While the APA specifically states that "the reviewing court shall decide all relevant questions of law," 5 U.S.C. § 706, court review of agency fact-finding is generally deferential. Under 5 U.S.C. § 706(2)(F), a reviewing court may "set aside agency action, findings, and conclusions" if "unwarranted by the facts[,] to the extent that the facts are subject to trial de novo by the reviewing court." As the Supreme Court stated in *Citizens to*

*Preserve Overton Park, Inc. v. Volpe,* such de novo review is authorized in two situations: first, "when the action is adjudicatory in nature and the agency factfinding procedures are inadequate," or, second, "when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citing H.R.Rep. No.1980 (May 3, 1946)). These exceptions do not apply to § 145 cases; the patent application process is not adjudicatory and new issues cannot be raised in a § 145 action. *See Newman,* 877 F.2d at 1579 (citing *DeSeversky,* 424 F.2d at 858). A third (and final) exception to the limited review under the APA exists: where another statute explicitly provides for de novo review. *See United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 714–15, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

Even before the 1946 enactment of the APA, *see* Act of June 11, 1946, 60 Stat. 243, the Supreme Court had held that provisions for district court review—even in a suit in equity—would not be read to imply the power to go outside the agency record. For example, in *Tagg Bros. & Moorhead v. United States,* the Court discussed that although the Packers and Stockyards Act of 1921, 7 U.S.C. §§ 181–231, provided for suits to be brought in federal district court to enjoin the enforcement of agency orders, this did not imply trial de novo. 280 U.S. 420, 444–45 & n. 4, 50 S.Ct. 220, 74 L.Ed. 524 (1930). Judicial review of orders of the Secretary was "restricted" by the following statutory language: "If, after hearing, that court determines that the order was regularly and duly served, and that the carrier is in disobedience of the same, the court shall enforce obedience." *Tagg Bros.,* 280 U.S. at 444 n. 4, 50 S.Ct. 220 (quoting 49 U.S.C. § 16(12)). The Court explained:

A proceeding under section 316 of the Packers and Stockyards Act is a judicial review, not a trial de novo. The validity of an order of the Secretary, like that of an order of the Interstate Commerce Commission, must be determined upon the record of the proceedings before him [except with regard to certain constitutional claims]. . . . On all other issues his findings must be accepted by the court as conclusive, if the evidence before him was legally sufficient to sustain them and there was no irregularity in the proceeding. *To allow his findings to be attacked or supported in court by new evidence would substitute the court for the administrative tribunal as the rate-making body.* Where it is believed that the Secretary erred in his findings because important evidence was not brought to his attention, the appropriate remedy is to apply for a rehearing before him or to institute new proceedings.

280 U.S. 420, 443–45, 50 S.Ct. 220, 74 L.Ed. 524 (1930) (emphasis added; footnote omitted).

The Court disposed of similar arguments in the context of district court actions authorized by the judicial review provision of the Communications Act of 1934, 47 U.S.C. § 402(a).[20] *Nat'l Broadcasting Co. v. United States,* 319 U.S. 190, 227, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). The Court held that such suits were not de novo, and the review was limited to the agency record: "The court below correctly held that its inquiry was limited to review of the evidence before the Commission. *Trial de novo of the matters heard by the Commission and dealt with in its Report would have been improper." Id.* at 227, 63 S.Ct. 997.

Similarly, in *Bianchi* the Court held that suits brought in the Court of Claims under the Wunderlich Act were not trials de novo, but were limited to the agency record. 373 U.S. at 713–15, 83 S.Ct. 1409. The Court noted that "the standards of review adopted in the Wunderlich Act— 'arbitrary,' 'capricious,' and 'not supported by substantial evidence'—have frequently been used by Congress and have consistently been associated with a review limited to the administrative record." *Id.* at 715, 83 S.Ct. 1409. The Court gave the following general rule:

> [T]he reviewing function is ordinarily limited to consideration of the decision of the agency or court below *and of the evidence on which it was based.* Indeed, in cases *where Congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, this Court has held that consideration is to be confined to the administrative record* and that no de novo proceeding may be held.

*Id.* at 714, 83 S.Ct. 1409.

Previously, this court rejected the notion that the APA applied to fact-finding by the PTO when reviewed on direct appeal here. *In re Zurko,* 142 F.3d 1447 (Fed.Cir.1998) (en banc). The Supreme Court reversed, holding that the Federal Circuit must review fact-finding by the PTO using the framework set forth in the APA. *Dickinson v. Zurko,* 527 U.S. 150, 165, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The Court noted that for a statute to create exceptions to the APA, it must do so clearly. *Id.* at 155, 119 S.Ct. 1816. And the circumstances under which the APA provides for de novo review of factual issues are "narrow." *Overton Park,* 401 U.S. at 414, 91 S.Ct. 814.

■ Where the statute, as here, provides for district court review, a de novo

---

**20.** The Court had previously characterized an action based on this statute as "a plenary suit in equity." *Columbia Broadcasting Sys. v. United States,* 316 U.S. 407, 415, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942).

trial is generally not appropriate unless the statute specifically provides for it. Section 145 does not. Section 145 merely states that "[a]n applicant dissatisfied with the decision of the Board" may "have remedy by civil action against the Director in the United States District Court for the District of Columbia." This is in contrast to other statutes that do provide explicitly for de novo review in the district courts. Such statutes are very clear; when Congress intends review by de novo trial, Congress explicitly authorizes de novo trial.[21]

■ In light of *Zurko*, we determined that actions under § 145 are subject to the strictures of the APA. *See Mazzari v. Ro-*

*gan*, 323 F.3d 1000, 1004 (Fed.Cir.2003) ("[A] reviewing court, whether this court or the district court, applies the 'substantial evidence' standard of review to findings of fact made by the [B]oard."). Of course, in § 145 actions, review is not strictly confined to the agency record. *Zurko*, 527 U.S. at 164, 119 S.Ct. 1816. But neither are proceedings wholly de novo; the admission of new evidence is limited by the APA.[22] *Mazzari*, 323 F.3d at 1005. The Supreme Court in *Zurko* left open the question of how to apply the APA to our review of PTO decisions in various circumstances, including § 145 actions. *See* 527 U.S. at 164, 119 S.Ct. 1816.

---

21. *See, e.g.,* Food Stamp Act, 7 U.S.C. § 2023(a)(15) ("The suit in the United States district court or State court *shall be a trial de novo* by the court in which the court shall determine the validity of the questioned administrative action in issue...."); *Ibrahim v. United States*, 834 F.2d 52, 53–54 (2d Cir. 1987) ("The Food Stamp Act's de novo review provision embodies a different and broader scope of review than that available under the APA ... [*Camp v. Pitts* ] is not on point. That case involved review of a decision by the Comptroller of the Currency denying a national bank charter, and no statute or regulation provided for de novo review. The APA therefore governed. Here, in contrast, the Food Stamp Act specifically provides that review of FNS determinations 'shall be a trial de novo.' 7 U.S.C. § 2023(a)."); 7 U.S.C. § 499g(c) (providing that, for review of reparations orders by Department of Agriculture, "Either party adversely affected by the entry of a reparation order by the Secretary may ... appeal therefrom to the district court.... Such suit in the district court *shall be a trial de novo and shall proceed in all respects like other civil suits for damages*, except that the findings of fact and order or orders of the Secretary shall be prima-facie evidence of the facts therein stated"); *see also* 19 U.S.C. § 1592(e) (providing that, for review of customs penalties for negligence or fraud, "Notwithstanding any other provision of law, in any proceeding commenced by the United States in the Court of International Trade for the recovery of any monetary penalty claimed under this section ... all issues, including the amount of the penalty, *shall be tried de novo* "); *United States v. Ford Motor Co.*, 463 F.3d 1286, 1297 (Fed.Cir.2006) (finding that even the explicit language of § 1592(e) should interpreted narrowly as providing for de novo review only of certain aspects of the customs determination, not to "permit an importer to end-run the protest provisions").

Only in very rare cases has the Supreme Court held that a new record may be made in the District Court in the absence of specific statutory authorization. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798–99, 93 S.Ct. 1817, 36 L.Ed.2d 668 (finding that private-sector employees are entitled to trial de novo under Title VII); *accord Chandler*, 425 U.S. at 845, 96 S.Ct. 1949 (for public employees under Title VII). However, the statutory scheme makes clear that "Title VII does not provide the [EEOC] with direct powers of enforcement. The [EEOC] cannot adjudicate claims or impose administrative sanctions. Rather, final responsibility for enforcement of Title VII is vested with federal courts." *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 44–45, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

22. A central flaw of the dissent is that it believes evidence in § 145 actions is limited only by the Federal Rules of Evidence. *See* Dissent at 1280. Contrary to the dissent's argument, however, it is not enough that § 145 is silent about evidence or that an appeal is available under § 141. *See* dissent at 1280–81. The Supreme Court has recently stated that patent law should not lightly depart from accepted legal principles of general applicability. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390–94, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). The ambiguous silence of § 145 on the admissibility of evidence does not meet the high bar the Su-

In light of the hybrid nature of § 145 actions, we have held that in the absence of new evidence, a district court must review the decision of the Board for substantial evidence, but for factual questions where new evidence is before the district court, the district court makes de novo findings. *Fregeau*, 776 F.2d 1034.[23] However, admitting new evidence without restriction would defeat the purpose of the APA, as applicants could then always submit new evidence whenever they desired de novo review; allowing new evidence unnecessarily will convert deferential review "into effectively de novo review." *Axiom Resource Mgmt. v. United States*, 564 F.3d 1374, 1380 (Fed.Cir.2009).

Nothing in the language of § 145 requires a de novo trial. The dissent makes much of the phrase "a civil action" in the statute, arguing that it requires a de novo action despite the general rule that review is on the agency record. It should be noted, however, that the language of the predecessor statute referred to a "bill in equity." Even before the APA, the Supreme Court repeatedly held that general language authorizing judicial review does not create a trial de novo, and that much more specific language is required. *See, e.g., Nat'l Broadcasting*, 319 U.S. at 227, 63 S.Ct. 997; *Tagg Bros.*, 280 U.S. at 444–45 & n. 4, 50 S.Ct. 220.

Nor do the cases addressing § 145 support the dissent's de novo standard. As discussed above, the Supreme Court has never directly considered the scope of § 145 with regard to new evidence, and the one reference to § 145 in a Supreme Court decision sheds little light on the issue. *Zurko* involved the question of what was the proper standard of review on direct appeal to the Federal Circuit under § 141, and although the Supreme Court noted that a § 145 claimant can "present to the court evidence that the applicant did not present to the PTO," the Court said nothing about when or under what circumstances such evidence could be introduced. *See Zurko*, 527 U.S. at 164, 119 S.Ct. 1816.

As the Supreme Court stated in *Overton Park*, where "agency factfinding procedures are inadequate," the APA allows a district court to take additional evidence. For example, the PTO does not take oral testimony in an examination of a patent application. In some cases credibility determinations will be very important to the resolution of the case, for example, where there is a question about the date of reduction to practice which will determine what is, or is not, prior art. In such circumstances, it makes sense to permit the district court to hear live testimony under *Overton Park* to resolve credibility issues because the PTO procedures are inadequate.

Some restrictions on the ability of an applicant to introduce new evidence in a § 145 action are therefore required under the APA, although there is certainly not a blanket exclusion of new evidence, either.[24]

## C.

■ Hyatt and the dissent argue that proceedings under § 145 are (or should be)

---

preme Court has set for implying trial de novo.

**23.** In *Zurko*, the Supreme Court noted that we may need to adjust standards of review to prevent anomalous results under the APA, citing *Fregeau* with apparent approval. *See Zurko*, 527 U.S. at 164, 119 S.Ct. 1816.

**24.** The dissent complains that we "blur[ ] the line between an appeal pursuant to § 141 and the civil action of § 145." Dissent at 1289.

However, the availability of live direct testimony and cross-examination would make a section 145 action quite different from a section 141 appeal, regardless of whether some evidence available to the applicant but not submitted to the PTO would be excludable. Just because proceedings under the two sections are *different* does not mean they should be *as different as possible;* the dissent lacks convincing support to require the specific difference it wishes to create. In any event, de

entirely de novo if the plaintiff so wishes. However, the arguments in favor of de novo proceedings are unpersuasive. Hyatt focuses on isolated statements by this and other courts that a § 145 action is a "de novo" proceeding, but ignores the context of—and qualifications on—such statements. Although the Seventh Circuit acknowledged that evidence could be excluded because it was not presented to the Patent Office, the court still referred to a case brought under Revised Statutes § 4915 as "a de novo trial." *Globe–Union*, 103 F.2d at 728. As the district court from which Hyatt's appeal is taken has aptly noted, § 145 actions

> are sometimes denominated "trials de novo", but such use of this term is somewhat loose.... Additional evidence is admissible in support of contentions advanced by the parties in the Patent Office. It is this feature that has led to the inaccurate use of the appellation "trials de novo" in these actions. There is a limitation on the admissibility of supplementary evidence. Such evidence as was available to the parties, but was withheld from the Patent Office as a result of fraud, bad faith, or gross negligence, may be excluded at the trial.

*Monsanto Co. v. Kamp*, 269 F.Supp. 818, 822 (D.D.C.1967); *see also Killian v. Watson*, 121 U.S.P.Q. 507, 507 (D.D.C.1958) ("It is equally well settled that the proceedings of the District Courts under § 145, though de novo, are not wholly ignorant of what has gone before."); *MacKay v. Quigg*, 641 F.Supp. 567, 570 (D.D.C.1986) ("For that reason, despite the 'de novo' label accorded judicial review under § 145, courts have limited the ad-

novo proceedings under § 145 are disallowed by the APA.

**25.** Commissioner Thomas's comments appear to be focused on interference cases rather

missibility of certain kinds of evidence."); *cf. Conservolite, Inc. v. Widmayer*, 21 F.3d 1098, 1102 (Fed.Cir.1994) ("While the expression 'de novo' is often used to describe a § 146 action, the statute does not use this language or state that new issues can freely be raised. Section 146 authorizes the district court on review to accept new testimony, but normally only as to issues raised by the parties during the proceedings below or by the Board's decision.").

The dissent argues that testimony given before Congress in 1926 compels the conclusion that a de novo trial is available under § 145 in all circumstances. Dissent at 3–7. During 1926 hearings on proposed patent statute reforms similar to those enacted in 1927, Commissioner Thomas E. Robertson, in an attempt to persuade Congress to eliminate altogether bills in equity to obtain patents, stated that plaintiffs in such suits could

> file testimony bringing in evidence that they *could have* brought in before but did not bring in before, and after dragging a man through all this procedure which you have said is so complicated and burdensome, start *de novo* in court, and bring in testimony not taken the first time.

*To Amend Section 52 of Judicial Code and Other Statutes Affecting Procedure in Patent Office: Hearings on H.R. 6252 and H.R. 7087 Before the House Committee on Patents*, 69th Cong., 1st Sess. 81 ("*H.R. 6252 Hearing*") (emphasis added). However, characterizations by Patent Office officials are not necessarily indicative of the intent of Congress, particularly where the witnesses opposed the legislation.[25] As the Supreme Court has noted in *Bryan v. United States*, the "the fears and doubts of the opposition are no authoritative guide to

than ex parte ones. *H.R. 6252 Hearing* at 78–82.

the construction of legislation. In their zeal to defeat a bill, they understandably tend to overstate its reach." 524 U.S. 184, 196, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) (citations, brackets, and quotation marks omitted). Stray comments by other witnesses supporting the legislation are also distinctly unpersuasive. The dissent quotes Representative Albert H. Vestal as saying a bill under Revised Statutes § 4915 "is not an appeal. It is the bringing of a new suit." Dissent at 1281 (quoting *H.R. 6252 Hearing* at 36). Even statements by members in floor debate are entitled to little weight. *Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) ("In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill.... We have eschewed reliance on the passing comments of one Member and casual statements from the floor debates." (citations omitted)).

While not irrelevant to the extent that Congress enacted § 145 based on existing practice under Revised Statutes § 4915, this legislative history can hardly be said to be dispositive, or even particularly probative, of the issue in the present case, as the majority clearly concluded in *Fregeau,* 776 F.2d at 1037–38. And even to the extent this legislative history is considered, much of it only supports the undisputed general rule that applicants *may* submit certain evidence not previously before the PTO in a § 145 action. *See, e.g., H.R. 6252 Hearing* at 81 (Paul) ("If we go

into a court of equity the parties may use the record that they have in the Patent Office and may supplement it by additional evidence."). But none of the cited Congressional testimony specifically addresses situations where an applicant sought to overcome *the consequences of his own refusal to adhere to the rules of prosecuting a patent application.* Indeed, absent from the legislative history is any discussion of the admissibility of evidence being proffered or objections to evidence.

Furthermore, the "evaluation of congressional action ... must take into account its contemporary legal context." *Cannon v. Univ. of Chicago,* 441 U.S. 677, 698–99, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978).[26] Although issued several months after Congress' 1927 revisions to patent laws, *Barrett* predated the 1952 Patent Act by a quarter of a century, which, combined with Congress' statement that § 145 and § 146 made "no fundamental change in the various *appeals* and *other review* of Patent Office action," [27] S.Rep. No. 82–1979 (1952) (emphasis added), suggests that Congress approved of the cases holding that patent applicants could not present to a district court evidence they should have but did not present to the Patent Office. And this legislative history predated the 1946 enactment of the APA by two decades.[28]

---

**26.** *But see Catron County Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.,* 75 F.3d 1429, 1438 (10th Cir.1996) ("Although a proponent of congressional acquiescence need not show that the acquiescence is 'specifically embodied in a statutory mandate,' he bears the burden of showing 'abundant evidence that Congress both contemplated and authorized' the previous noncongressional interpretation in which it now acquiesces.").

**27.** This is not equivalent to making "no substantive changes to § 4915," as the dissent asserts. *See* Dissent at 1281.

**28.** The dissent's heavy reliance on the legislative history of the 1927 revisions to the Patent Act, *see* Dissent at 1280–82, is therefore anachronistic.

Hyatt's argument for a de novo action is also inconsistent with our precedent that the district court must apply a deferential standard to PTO fact-finding. *See Mazzari*, 323 F.3d at 1004–05. "Clearly, the applicant does not start over to prosecute his application before the district court unfettered by what happened in the PTO." *Fregeau*, 776 F.2d at 1038. Indeed, the Supreme Court assumed there would be cases brought under § 145 in which "the district judge does no more than review PTO factfinding." *Zurko*, 527 U.S. at 164, 119 S.Ct. 1816. Therefore, in the absence of new evidence, the district court is obliged to accept the facts as found by the PTO unless not supported by substantial evidence. *Mazzari*, 323 F.3d at 1005; *see also Zurko*, 527 U.S. at 162–65, 119 S.Ct. 1816. When new evidence is admitted, the district court makes de novo factual findings, but only as to the new evidence. *See Mazzari*, 323 F.3d at 1004. In other words, the district court must defer to the PTO's fact-finding except where appropriately admitted new evidence conflicts with a fact found by the PTO or presents a new factual issue that the PTO did not consider. *See id.*

## III.

### A.

■ If the district court's ruling had been a conventional evidentiary ruling, we would apply the standard of review of the appropriate regional circuit. *See Advanced Cardiovascular Sys. v. Medtronic, Inc.*, 265 F.3d 1294, 1308 (Fed.Cir.2001). However, the challenged evidentiary ruling here is partly tied to issues of interpretation of the patent law. To this extent, we apply Federal Circuit law and review these issues of legal interpretation de novo. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed.Cir.2004). To the extent that district court evidentiary rulings apply the correct legal standard, we

review them for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("[A]buse of discretion is the proper standard of review of a district court's evidentiary rulings."); *see also Conservolite*, 21 F.3d at 1102 (noting district court's discretion to admit testimony on new issues in certain circumstances in action under § 146).

■ Congress created this court to promote a uniform interpretation of the patent laws. *C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 878 (Fed.Cir.1983). The cases show that the regional circuits repeatedly excluded, in some circumstances, evidence that an applicant had not presented to the Patent Office. In making discretionary decisions, courts should not lightly disregard historical practice. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (Roberts, C.J., concurring). And the Supreme Court has warned us that "courts must be cautious before adopting changes that disrupt the settled expectations of the inventing community," even if this means rejecting a "bright-line rule." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 739, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002).

■ There is long history of excluding evidence not submitted to the PTO, and of a consensus that evidence may be excluded if it was not submitted to the PTO *at least* due to fraud, gross negligence, bad faith, or intentional suppression. *See, e.g., Cal. Research*, 356 F.2d at 820 n. 18 (excluding evidence not submitted to Patent Office merely due to "negligence"); *Velsicol*, 579 F.2d at 1046 (excluding evidence not submitted to Patent Office merely due to lack of "diligence"); *Killian v. Watson*, 121 U.S.P.Q. at 509 (excluding new evidence because failure to submit it to Patent Office was "grossly negligent"). The Di-

rector argues in favor of a negligence standard, although he also argues that Hyatt's conduct amounts to gross negligence. *See* Appellee's Br. at 28–53. Hyatt himself argues that the "prevailing law in the District of Columbia" is that evidence not submitted to the PTO can be excluded only if the failure was due to "gross negligence." Appellant's Br. at 27. Hyatt also states that if we exclude some evidence in § 145 actions, gross negligence should be the applicable standard. *Id.* at 28.

We note, however, that the terminology of negligence (and gross negligence) is somewhat inapposite to the issue of admissibility. Negligence (which is roughly the absence of diligence) implies a duty. While patent applicants do have certain duties to the PTO, including duties of disclosure,[29] beyond a certain point, how much more evidence to submit is in large part a determination for which a patentee and his agents must use good judgment.[30] While there are certainly many factors which could go into such a decision, a duty to the PTO may not necessarily be one of them. We believe a semantic shift away from negligence will help focus attention on the factors that are pertinent to whether an applicant should be allowed to introduce evidence before the district court over an objection by the Director.

Hyatt was obligated to respond to the examiner's written description rejection by *In re Alton,* 76 F.3d 1168, 1175 (Fed.Cir. 1996), by explaining where in the specification support for each of these limitations could be found. We held in *Alton* that after studying the specification, an examiner can make out a prima facie case of lack of adequate written description, thus shifting the burden of production to the applicant, simply by identifying specific claim limitations and stating that despite reviewing the specification, he could not find support for those limitations. 76 F.3d at 1175; *see also In re Wertheim,* 541 F.2d 257, 263–64 (CCPA 1976) ("[T]he PTO has the initial burden of presenting evidence or reasons why persons skilled in the art would not recognize in the disclosure a description of the invention defined by the claims;" if the PTO does so, the applicant bears the burden of rebutting this showing.); Manual of Patent Examining Procedure ("MPEP") § 2163.04(I)(B) (reiterating holding of *Alton* ).

Any time from the January 7, 1997 office action rejecting Hyatt's new claims for Hyatt's failure to "specifically point out the support for" the claims pursuant to the examiner's reading of MPEP § 714.02 up through when Hyatt filed his initial appeal brief before the Board on September 2, 1998, Hyatt could have declared where in his specification the written description support for each of the disputed limitations resided. After the examiner stated that he had read through the specification and could find no support for certain claim limitations, all Hyatt needed to do was show the examiner where in the specification support existed—something that should have been simple for him, the person most familiar with the specification. The Board noted, "It is far easier for appellant to describe where the limitation he wrote is disclosed than for the Office to prove that the limitation is not disclosed." J.A. 11600–01. Rejection as per *Alton* was in essence the examiner telling Hyatt to point to written description support in the

---

29. "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section." 37 C.F.R. § 1.56(a).

30. Information "cumulative to information already of record" is not "material to patentability." 37 C.F.R. § 1.56(b).

specification for his claims. Hyatt, however, refused to cooperate, even though he necessarily possessed the information the examiner sought by the time he filed his application.

*On these facts*, the district court's exclusion of Hyatt's new evidence must be affirmed. The district court found that Hyatt was "negligent" in failing to submit the evidence disclosed in the Hyatt declaration to the PTO because he was obligated to do so, he had a fair opportunity to do so, and he failed to give an adequate explanation for his failure to submit it. *Hyatt II*, 2005 WL 5569663, at *3, 5–7. However, it is clear from the record that Hyatt willfully refused to provide evidence in his possession in response to a valid action by the examiner. Such a refusal to provide evidence which one possessed was grounds in *Barrett* to exclude the withheld evidence. Similarly, we hold that in light of Hyatt's willful non-cooperation here, the district court did not abuse its discretion by excluding the Hyatt declaration.[31]

Instead of rebutting the examiner's prima facie case that the claims were not supported by adequate written description, Hyatt argued that the burden of digging through the 238–page specification remained on the examiner, even though many limitations clearly do not appear verbatim in the specification. Before the Board, Hyatt submitted a table showing where some, but not all, of the substituent words of these limitations could be found, but this table was for many limitations of no help whatsoever in locating support for the claim limitations at issue.[32] If the Board was wrong, it was because Hyatt purposefully kept it in the dark by not presenting evidence within his possession to overcome the examiner's rejections for lack of written description. This blatant non-cooperation was willful. Allowing Hyatt to escape the consequences of his refusal to timely submit his own information to the PTO that he was required by law and requested by the examiner to submit would hardly be consonant with the APA or the legislative purpose of § 145.[33]

### B.

Hyatt makes four arguments as to why his refusal to present responsive evidence to the PTO should not bar him from presenting his declaration in district court: (1) the Board's decision presented new grounds of rejection beyond those of the examiner and thus he was not on notice that such evidence was required; (2) he

---

**31.** We leave to future cases consideration of whether evidence may be excluded on grounds other than the type of refusal at issue here and in *Barrett*.

**32.** For example, the examiner could find no support in Hyatt's specification for "block boundary smoothing" claim language. J.A. 20–21. According to Table–1, "block" appears on pages 25 through 83 and 128 through 164; "boundary" on pages 14 and 41; and "smoothing" once, on page 232. J.A. 10832. The words "boundary" and "smoothing" are separated by almost two hundred pages. Similarly, the examiner stated he could find no support in the specification for the claimed "quantization weighting processor." According to Table–1, "quantization" appears on pages 231 through 236,

"weight" appears on pages 162 through 164, and "processor" on pages 85 through 98. To suggest Table–1 is helpful in determining where in the specification support for these limitations may be found borders on insolent.

**33.** The instant case is distinguishable from *Burlington Industries v. Quigg*, where we upheld a district court's reversal in a § 145 action of claim rejections by the PTO. 822 F.2d 1581, 1582, 1584 (1987). We noted that the district court's decision was based largely on live testimony (which was unavailable during proceedings before the PTO) and if, under such circumstances the district court reached a conclusion different from that of the PTO, "that is not contrary to the legislative purpose of section 145 de novo review. Indeed, it is in fulfillment of that purpose." *Id.* at 1584.

was unaware prior to this court's decision in *Hyatt I* that he bore the burden of producing evidence or explanation to rebut the examiner's written description rejections; (3) since the Board reversed the examiner's rejections for 38 of the 117 rejected claims, his efforts at providing evidence to the Board must also have been reasonable as to the remaining 79 claims; and (4) he relied on the expertise of the PTO and thus reasonably believed that the PTO did not require this evidence. We address each argument in turn.

First, we agree with the district court that the Board decision did not include any new ground of rejection. *See Hyatt II,* 2005 WL 5569663, at *6. The district court correctly noted that an applicant must have an opportunity to respond to new grounds of rejection relied on by the Board. *See In re Kronig,* 539 F.2d 1300, 1302–03 (CCPA 1976). But whether a ground of rejection is "new" depends on whether the applicant had a "fair opportunity to react to the thrust of the rejection." *Id.* Here, after reviewing the Board decision and the rejections of the examiner, we agree with the district court that the Board did not rely on any new ground of rejection. For fifty-nine of the seventy-nine claims still at issue, both the Board and the examiner relied on the same rationale, namely that one or more claim limitations—which they expressly identified— are not disclosed or adequately supported in the written description. While the Board's explanations were often, though not always, more detailed, the "thrust" of these rejections was identical to that of the examiner's corresponding rejections. The Board cannot be said to have presented a new ground of rejection simply by elaborating on the examiner's rejection or by using different words. *See In re Oetiker,* 977 F.2d 1443, 1445–46 (Fed.Cir.1992).

For the remaining twenty claims, claims 153 through 172, the district court noted that the Board may have gone beyond the scope of the examiner's rejections with regard to the claim limitation "making a product in response to image information." *See Hyatt II,* 2005 WL 5569663, at *6. However, as the district court correctly ruled, the Board's rationale as to these claims was not a new ground for rejection because it was simply a response to arguments raised by Hyatt in his briefing to the Board. *See id.* at *5–6. Thus, he had the opportunity to, and did, make arguments as to this ground. Hyatt argued for the first time to the Board that written description support existed in the specification because a "signal" could be a "product," and the Board rejected that view. Therefore, we reject Hyatt's argument that the Hyatt declaration must be admitted to afford him the opportunity to respond to the Board's new grounds for rejection because we hold that the Board did not present any new grounds.

Second, we reject Hyatt's argument that the timing of our decision in *Hyatt I* in 2007 excuses his failure to provide the Hyatt declaration to the PTO. In *Hyatt I,* we held that an examiner can shift the burden of proof of showing adequate written description by identifying specific claim limitations and clearly stating that despite reviewing the specification, he could not find support for those limitations. 492 F.3d at 1370–71. We relied directly on our 1996 decision in *Alton,* which stated the very same rule a decade earlier. *See* 76 F.3d at 1175. We then compared the *Alton* rule to MPEP § 2163.04(I)(B), which we held was a lawful articulation of the *Alton* rule. *Hyatt I,* 492 F.3d at 1370–71. Both *Alton* and MPEP § 2163.04(I)(B) were in effect at all times the '702 application was pending before the PTO. Thus, Hyatt was clearly on notice of his obligation to provide evidence or explanation to the examiner to rebut the written description rejections. His failure

to do so from 1997 to 2002 thus cannot be attributed to the fact that *Hyatt I* had not yet been decided.

Third, we agree with the district court that the Board's reversal of thirty-eight of the examiner's written description rejections does not establish Hyatt acted reasonably with regard to the seventy-nine rejections not reversed. *See Hyatt II,* 2005 WL 5569663, at \*6. As the district court correctly observed, the Board's reversals were based solely on its own independent analysis of the claims and written description. *Id.* The Board expressly stated that it did not, and could not, rely on anything provided by Hyatt, specifically noting that Table–1 did not provide any helpful information. J.A. 11594, 11600–01. We agree with the assessments of the Board and the district court; neither Table–1 nor its accompanying notes indicate where written description support can be found for any of the claim limitations at issue. The fact that the substituent words of a claim limitation are individually used in the specification does not explain how the specification discloses the claim limitation itself, and Table–1 does not even purport to address all of the claim limitations the examiner identified as lacking written description support. Thus, neither the Board's laudable efforts to thoroughly analyze the specification even in the absence of assistance from Hyatt, nor the limited information that Hyatt did provide to the Board, indicates that Hyatt provided the PTO with the information it needed to properly assess the patentability of his claims. In fact, if anything, the Board's consideration of Table–1 demonstrates that Hyatt had the opportunity to properly provide helpful information to the Board but, for reasons we need not identify, did not.

Lastly, Hyatt's alleged reliance on the expertise of the PTO also fails to support his case. The examiner clearly indicated that, *despite his expertise,* he could not identify written description support for numerous claim limitations. It was then incumbent on Hyatt to either cite to where support could be found in the written description or amend it to add the required support. *Hyatt I,* 492 F.3d at 1371.

In sum, Hyatt presents no acceptable excuse for his failure to properly present his declaration to the PTO.

That Hyatt willfully refused to respond to the examiner's written description rejections by pointing out where in the specification support for his claims could be found is the primary reason we affirm the district court's exclusion of the Hyatt declaration. This failure of Hyatt, who at the time had been a patent agent for over twenty years, to perform a simple task that it was his burden to perform is inexcusable in the circumstances of this case. However, consideration of all the facts of this case—including the absence of an adequate explanation for Hyatt's failure to present the evidence earlier, the form of the evidence (documentary instead of testimonial), the Director's objection to the Hyatt declaration and his rehearing brief before the district court, and Hyatt's perverse unhelpfulness—only reinforces this conclusion. We hold that the district court did not commit any legal error or abuse its discretion in excluding Hyatt's declaration because of Hyatt's failure to present this evidence earlier.

### C.

The dissent incorrectly describes our decision as promulgating a "sweeping exclusionary rule." *See* Dissent at 1279. We have not adopted a "sweeping" or *"per se* rule." *See id.* at 1279–80, 1287. We express no opinion as to admissibility of evidence in the multitude of variegated factual scenarios that may arise in the future which the dissent claims are decided today.

The dissent also characterizes the majority opinion as standing for something that it does not: that evidence must be excluded simply because it could have been presented to the PTO. *See* Dissent at 1284. Instead, we have merely reached the unremarkable conclusion that it is unreasonable to believe Congress intended to allow a patent applicant in a § 145 action to introduce new evidence with no regard whatsoever as to his conduct before the PTO, and that, specifically, Congress did not intend that evidence owed,[34] requested and willfully withheld from the PTO must nevertheless be admitted in a § 145 action.

The dissent also appears to misapprehend the import of *Alton.* There is, under *Alton,* only one acceptable response to a written description rejection: showing the examiner where by column and line number in the specification he may find written description support for each disputed claim limitation.[35] Here, not only was Hyatt's response to the written description rejections completely and wholly inadequate, it was willfully so. He simply refused to respond as required by *Alton* to the requests of the examiner for citations to the specification, and he clearly did so deliberately, thus impeding the examination the PTO is legally required to conduct.

## IV.

■ Since Hyatt did not offer any other evidence in his § 145 action, the district court correctly reviewed the Board's decision solely on the record before the Board. We review a district court's grant of summary judgment de novo, applying the same standards as the district court. *Ethicon Endo–Surgery v. U.S. Surgical*

*Corp.,* 149 F.3d 1309, 1315 (Fed.Cir.1998). In the § 145 context, in the absence of new evidence, the district court must enter judgment for the Director if the Board's findings regarding the lack of adequate written description are supported by substantial evidence. *See In re Curtis,* 354 F.3d 1347, 1352 (Fed.Cir.2004) (whether written description adequately supports claims is issue of fact); *Mazzari,* 323 F.3d at 1004–05 (absent new evidence, PTO fact-finding reviewed under substantial evidence standard in § 145 actions).

Hyatt argues that the Board's decision was not supported by substantial evidence because the record before the Board cited and contained adequate written description for all the claims rejected by the Board. When examined more closely, however, Hyatt's arguments rely almost entirely on Table–1. As noted earlier, Table–1 simply lists certain individual words used within various multi-word limitations, the number of times each such word appears in the specification, and "representative" pages in the specification where each word appears (or, in many cases, simply states that the word appears "throughout" the specification). For example, certain claims were rejected for lacking written description support for a "processor responsive to an accessed block of video pixel image information." J.A. 10643 ¶ 15. Table–1 indicates that "block" was used over 80 times on at least pages 25–83 and 128–164 of the specification; "information" was used over 100 times "throughout" the specification; "video" was used exactly eight times on at least pages 77, 166, and 168–71; etc. J.A. 10832. Table–1 does not, however, explain

---

34. The dissent's claim that we hold that Hyatt " 'owed' the PTO *all evidence he possesses* that is responsive to a rejection," Dissent at 1279–80 (emphasis added, citation omitted), is overbroad and illustrates the dissent's misunderstanding of our holding.

35. The dissent complains about Hyatt's burden of responding to, as the dissent calculates it, "2546 separate rejections." Dissent at 1288. The dissent does not acknowledge that this is proportional to Hyatt's prosecution of an application containing 117 pending claims spanning 79 pages. *See* J.A. 10411–89.

how any of these individual occurrences of these substituent words discloses a "processor responsive to an accessed block of video pixel image information." The same defect exists in each of Hyatt's arguments relying on Table–1 and so we are not persuaded by them.

In addition, Hyatt repeatedly points to raw source code printed in the specification as disclosing various features of his claims. Aside from self-serving attorney arguments, Hyatt points to no evidence that would enable the district court or this court to determine whether the source code actually does disclose these features. Moreover, he made the same unsupported arguments to the PTO, and despite its expertise the PTO found them to be unhelpful in determining whether the written description adequately supported the claims at issue. We therefore agree with the district court that the Board's decision was supported by substantial evidence. There was no error in the district court's grant of summary judgment.

## CONCLUSION

For the reasons stated above, the district court's grant of summary judgment is *AFFIRMED.*

MOORE, Circuit Judge, dissenting.

The majority takes away this patent applicant's fundamental right to a "civil action to obtain [a] patent" as granted by Congress in 35 U.S.C. § 145. Today the majority decides that a patent applicant may not introduce the inventor's declaration in a § 145 proceeding before the district court because the inventor had an "affirmative duty" or "obligation" to disclose this evidence to the PTO. His failure to fulfill his affirmative duty, by not disclosing evidence he could have disclosed to the PTO, results in such evidence being excluded from the district court § 145 proceeding. The district court made no fact findings indicating willful withholding or intentional suppression; in fact, the district court did not even conclude that Mr. Hyatt's conduct amounted to gross negligence, but rather excluded the evidence under a negligence "could have" standard. Nor did the PTO even argue, at any stage of these proceedings, that Mr. Hyatt's conduct in this case was willful or intentional. Nonetheless, the majority concludes that the applicant "owed," Maj. Op. at 1278, the PTO all evidence he possesses that is responsive to a rejection and that failure to fulfill this newly created "affirmative duty" amounts to willful withholding as a matter of law. There are only two possible ways to interpret the majority's willful withholding determination. Either the majority is engaging in appellate fact finding or it is determining that breach of its newly created affirmative duty is willful withholding as a matter of law. The latter leaves no room for fact finding in individual cases and takes the discretion completely away from the trial court. Ultimately, the majority's sweeping exclusionary rule is far broader than anything argued by the parties.

While the Supreme Court has characterized the § 145 action as a proceeding that is "in fact, and necessarily, a part of the application for the patent," the hallmark of the § 145 proceeding in the district court is that "all competent evidence" shall be heard subject only to "the ordinary course of equity practice and procedure." *Gandy v. Marble,* 122 U.S. 432, 439, 7 S.Ct. 1290, 30 L.Ed. 1223 (1887); *see also Butterworth v. United States ex rel. Hoe,* 112 U.S. 50, 61, 5 S.Ct. 25, 28 L.Ed. 656 (1884). To be clear, Mr. Hyatt does not argue that § 145 actions are de novo trials that are entirely separate from PTO proceedings. Mr. Hyatt argues only that new evidence may be admitted in a § 145 action. He acknowledges that deferential review (substantial evidence) is given to Board fact

findings absent new evidence in § 145 proceedings and also that evidence pertaining to new issues cannot be introduced. ·See Appellant's Br. 1, ·5, 8, 10–11, 14–15; see also Conservolite, Inc. v. Widmayer, 21 F.3d 1098 (Fed.Cir.1994) (holding that in a § 146 action, evidence pertaining to *new issues* that were not raised before the PTO may be excluded).

The majority's decision to affirm the district court's exclusion of the inventor's own declaration in a § 145 civil action severely restricts the rights that Congress afforded patent. applicants, making this proceeding more of an appeal than the new civil action contemplated and enacted by Congress. Moreover, by concluding that an inventor has an "affirmative duty" to submit his own declaration in response to a rejection by the PTO, lest he be prevented from admitting the material in any subsequent district court proceeding, the majority makes it impossible for inventors to ever testify in a § 145 action unless their testimony had first been proffered to the PTO. I cannot agree that this was what Congress contemplated when it enacted § 145, and therefore I dissent.

## I. Mr. Hyatt's Declaration Should Not Be Excluded

Congress enacted a statute that permitted a "civil action" and gave patent applicants the right to present new evidence in a trial in the district court despite that this right would allow the applicant to introduce "evidence that they could have brought in before" the PTO, potentially resulting in "dragging an opponent through a second time." *To Amend Section 52 of Judicial Code and Other Statutes Affecting Procedure in Patent Office: Hearings on H.R. 6252 and H.R. 7087 Before the H. Comm. on Patents,* 69th Cong., 1st Sess. 80–81 (1926) (statement of Hon. Thomas E. Robertson, Commissioner of Patents) [hereinafter *To Amend Section 52* ]. Congress granted patent applicants

the right to a civil action in the district court distinct from their right of appeal. It is our obligation to protect the distinction Congress codified in § 145, not to reweigh the virtues of that decision. The § 145 proceeding is a civil action and ought to be governed by the same Federal Rules of Evidence that govern other civil actions. Patent cases do not need, nor should they have, special rules of evidence.

Section 145, titled "Civil action to obtain a patent," provides:

> An applicant dissatisfied with the decision of the Board of Patent Appeals and Interferences in an appeal under section 134(a) of this title may, *unless appeal* has been taken to the United States Court of Appeals for the Federal Circuit, *have remedy by civil action* against the Director in the United States District Court for the District of Columbia if commenced within such time after such decision, not less than sixty days, as the Director appoints. *The court may adjudge* that such applicant is entitled to receive a patent for his invention, as specified in any of his claims involved in the decision of the Board of Patent Appeals and Interferences, *as the facts in the case may appear* and such adjudication shall authorize the Director to issue such patent on compliance with the requirements of law. All the expenses of the proceedings shall be paid by the applicant.

35 U.S.C. § 145 (emphasis added).

The statute itself distinguishes the appeal that may be brought pursuant to 35 U.S.C. § 141 because a § 145 action is not an appeal; it is a "civil action." The statute obligates the district court to adjudicate the facts in this civil action. Because the statute affords no limitations on the type of evidence that ought to be admissible in a civil action brought under § 145, the standard Federal Rules of Evidence

that govern all civil actions ought to govern. The legislative histories of § 145 and its predecessor statute, section 4915 of the Revised Statutes, repeatedly *and without contradiction* indicate that the intent of Congress was to permit a patent applicant to bring a new suit built upon a new record. In testimony leading to the Patent Act of 1927, the Commissioner of Patents referred to a section 4915 suit as one where an applicant would proceed *"de novo"* in district court, with the right "to build up a new record" and bring in "further evidence that I might have put in before and drag you through another trail [sic] court." *To Amend Section 52,* at 79–80. The Commissioner of Patents was testifying in opposition to this statute, to this civil action in the district court. He testified that this statute that permits this "new record" results in "dragging an opponent through a second time." *Id.* at 80. In fact, he articulated these concerns a second time, noting that the statute allowed a patent applicant to "file testimony bringing in evidence that they could have brought in before [the PTO] but did not bring in before, and after dragging a man through all this procedure which you have just said is so complicated and burdensome, start *de novo* in court, and bring in testimony not taken the first time." *Id.* at 81; *see also id.* at 76 (statement of Karl Fenning, Former Assistant Commissioner of Patents) (arguing that "the best thing to do would be to cut out 4915 entirely for ex parte applications" to encourage the applicant to "put in all the testimony pertinent to his case" before the PTO).

Despite being presented with the policy reasons for not permitting a civil action, which allows the applicant to bring in evidence *he could have brought before the PTO,* Congress decided to adopt this approach. Mr. A.C. Paul, Chairman of the Patent Section of the Legislation Committee of the American Bar Association, made clear that he too understood section 4915 to permit the introduction of new evidence:

> While our committee would have the case start *de novo* after the decision of the board ... and the difference would be then if we went to the court of appeals by an appeal the decision must be based upon the same record. If we go into a court of equity the parties may use the record that they have in the Patent Office and may supplement it by additional evidence.

*Id.* at 81. Similarly, Congressman Albert H. Vestal stated that "if a party feels aggrieved, he can bring his suit in the equity court, but it is not an appeal. It is the bringing of a new suit." *Id.* at 36.[1] Charles E. Howson, Chairman of the Committee on Patent Law Revision for the American Bar Association, who was the "chairman of the committee that drew these bills" explained:

> The advantage of section 4915 is that it enables the party in interest, desiring to obtain a patent, to take evidence in a court or tribunal whose business it is to try issues of facts *and make up a record in addition to that he has been enabled to furnish the examiners in the Patent Office,* and therefore get before a court of competent jurisdiction everything connected with his rights and every fact connected with his patent; in other words, *have before him everything that*

---

1. *See also* Albert H. Walker, *The Law of Patents for Inventions* § 134 (5th ed. 1917) ("In order to decide the issues of such a bill in equity as is treated in this section, the court, where the bill is pending, will take testimony, and any other admissible evidence, according to the course of courts of equity; and will also consider whatever was before the Patent Office in the proceedings which resulted in the refusal to grant a patent.... The proceeding, however, is not revisory of the Patent Office proceeding, but is an original suit in equity....").

*courts in the country have before them in infringement cases.*

*Id.* at 21 (emphasis added); *see also To Amend the Statutes of the United States as to Procedure in the Patent Office and the Courts: Hearing Before the S. Comm. on Patents,* 69th Cong., 2d Sess. 13–14 (1926) (statement of Otto R. Barnett) (Pursuant to section 4915, you may file an action in the district court if·"you want a new record to bring out new things developed in your patent, in lieu of that you may file a new suit. . . . Now, when it came to ex parte cases, it was comparatively simple to say that the individual inventor may appeal, or he may start his new suit. . . . 'Well, somebody may want to start a new suit and bring out other and new things.' So we said, 'All right, take your choice; go on with a new suit, or appeal.' ").

These numerous statements confirm that when Congress enacted this statute, which does not limit the evidence that may be introduced in this "new suit" or "civil action," Congress did so with this purpose and intent. The majority attempts to sweep away all of the legislative history (as "anachronistic") claiming that the mere existence of *Barrett* "suggests that Congress approved of the cases holding that patent applicants could not present to a district court evidence they should have but did not present to the Patent Office." Maj. Op. at 1271–73. There are several problems with this theory. First, the parties agree and Congress clearly stated that the 1952 patent act made no substantive changes to § 4915. *See* Appellant's Br. 16; Appellee's Br. 45; S.Rep. No. 82–1979 (1952), *as reprinted in* 1952 U.S.C.C.A.N. 2394, 2400. Second, even the few courts

that excluded evidence prior to the 1952 patent act did so under a hodgepodge of different standards (diligence, intentional suppression or bad faith). Congress could not have implicitly adopted all of these differing standards. Indeed, Congress did not limit the type of evidence that the patent applicant may introduce precisely because it intended for a civil action under § 4915, now § 145, to be based upon a new record and new evidence, even if that new evidence could have been brought before the PTO. Congress intended that the district court in a § 145 action have everything that a court would have in an infringement suit. Under this standard, Congress certainly intended for an inventor, such as Mr. Hyatt, to be permitted to introduce his own declaration in a § 145 action.[2]

Moreover, to deter applicants from exactly the type of procedural gaming that concerns the majority, § 145 imposes on the applicant the heavy economic burden of paying "[a]ll the expenses of the proceedings." 35 U.S.C. § 145. This burden encourages applicants to present their best case to the PTO to avoid responsibility for all expenses in a § 145 proceeding. To allow this type of evidence in these civil actions was a policy decision committed solely to the discretion of Congress, which it duly made.

Not only does the majority decision conflict with the proper interpretation of § 145, but it is also in conflict with Supreme Court jurisprudence on this point. The Supreme Court has repeatedly and without limitation spoken to an applicant's right to "present to the court evidence that the applicant did not present to the PTO.

---

**2.** The Federal Rules of Evidence do not support the majority's exclusion of inventor statements. Inventor testimony is regularly admitted in infringement cases for various reasons: *Wang Labs., Inc. v. Toshiba Corp.,* 993 F.2d 858, 866 (Fed.Cir.1993) (written description);

*Phillips v. AWH Corp.,* 415 F.3d 1303, 1317 (Fed.Cir.2005) (en banc) (claim construction); *Cooper v. Goldfarb,* 154 F.3d 1321, 1330 (Fed. Cir.1998) (reduction to practice); *Symantec Corp. v. Computer Assocs. Int'l, Inc.,* 522 F.3d 1279, 1295 (Fed.Cir.2008) (conception).

The presence of such new or different evidence makes a factfinder of the district judge." *Dickinson v. Zurko,* 527 U.S. 150, 164, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). Supreme Court jurisprudence reflects a strong distinction between a § 141 appeal, in which new evidence is not permitted, and a § 145 action and its precursors, in which new evidence is freely admitted. A civil action under § 145—like the bill in equity before it and unlike an appeal—is "the exercise of original, the other of appellate, jurisdiction." *In re Hien,* 166 U.S. 432, 438, 17 S.Ct. 624, 41 L.Ed. 1066 (1897). A defining difference between an appeal and the bill in equity is the introduction of new evidence:

> It is evident that alternative rights of review are accorded an applicant,—one by appeal to the United States Court of Customs and Patent Appeals, the other by bill in equity filed in one of the federal district courts. In the first the hearing is summary and solely on the record made in the Patent Office; in the other a formal trial is afforded on proof *which may include evidence not presented in the Patent Office.*

*Hoover Co. v. Coe,* 325 U.S. 79, 83, 65 S.Ct. 955, 89 L.Ed. 1488 (1945) (citation omitted); *id.* at 87, 65 S.Ct. 955 (explaining that the legislative history makes clear that Congress intended to save to "litigants the option of producing new evidence in court, by retaining the equity procedure"); *see also Hill v. Wooster,* 132 U.S. 693, 697, 10 S.Ct. 228, 33 L.Ed. 502 (1890) ("The opinion of the circuit court discusses ... and states that considerable evidence was produced before the court which was not before the patent-office."). And the Supreme Court has distinguished an appeal from the bill in equity under section 4915 (the precursor to § 145):

> It is thereby provided [in section 4915] that the applicant may have remedy by bill in equity. This means a proceeding in a court of the United States having original equity jurisdiction under the patent laws, *according to the ordinary course of equity practice and procedure.* It is not a technical appeal from the patent-office, like that authorized in section 4911, confined to the case as made in the record of that office, but is prepared and heard upon *all competent evidence* adduced, and upon the whole merits. Such has been the uniform and correct practice in the circuit courts. *Whipple v. Miner,* 15 F. 117 (C.C.D.Mass.1883); *Ex parte Squire,* 3 Ban. & A. 133; *Butler v. Shaw,* 21 F. 321.

*Butterworth,* 112 U.S. at 61, 5 S.Ct. 25 (emphasis added).

In *Butterworth,* the Supreme Court held that a section 4915 action should be heard on "all competent evidence," which is governed "according to the ordinary course of equity practice and procedure." *Id.* The majority explains that competent evidence is synonymous with admissible evidence, *see* Maj. Op. at 1260 n. 12, but suggests that the Supreme Court was silent on what evidence was competent (admissible). In fact, the preceding sentence in *Butterworth* explained that the admissibility or competence is determined "according to the ordinary course of equity practice and procedure" (i.e. the Federal Rules of Evidence and Civil Procedure). *Butterworth,* 112 U.S. at 61, 5 S.Ct. 25. Evidence is admissible in a § 145 civil action limited only by the ordinary rules of evidence and procedure that apply to all civil actions. The majority claims that reading *Butterworth* as holding that evidence is admissible in a § 145 civil action limited only by the ordinary rules of evidence and procedure that apply to all civil actions is contrary to the Supreme Court's decision in *Gandy.* However, the very quote in *Gandy* that the majority cites for this proposition, Maj. Op. at 1260, reaffirms this holding of *Butterworth.* The fact that the

"proceeding, is, in fact and necessarily, a part of the application for the patent," is not to the contrary. The cases endorsed by the Supreme Court in *Butterworth*, like the Supreme Court itself, hold that the section 4915 action is one in which *any evidence* may be admitted:

> It would seem, therefore, that the course of proceeding in either case is clear-viz., "according to the course of equity." Even in the absence of these explicit terms it would be apparent that a suit in equity would have to be governed in its proceedings by equity rules.... The provisions of the acts of congress, already referred to, allowing the party failing in his application, to file a bill, do not restrict the hearing, in this court, to the testimony used before the commissioner. *Either party, therefore, is at liberty to introduce additional evidence, or rather, to speak more accurately, the hearing is altogether independent of that before the commissioner, and takes place on such testimony as the parties may see fit to produce agreeably to the rules and practice of a court of equity.*

*Ex parte Squire*, 22 F. Cas. 1015, 1017 (C.C.E.D.Mo.1877) (No. 13,269) (emphasis added).[3] This case, which on this very point the Supreme Court held was "correct," holds that the only limitations on evidence that may be introduced in these proceedings are those limitations that arise under the normal rules—in this case the Federal Rules of Evidence. *See id.*

The majority discusses the importance of preserving settled expectations. Our own precedent is replete with examples of § 145 actions in which district courts considered new evidence that could have been presented to the PTO but was only first presented to the district court. *See, e.g., Fregeau v. Mossinghoff*, 776 F.2d 1034, 1036 (Fed.Cir.1985) (applicant submitted a new expert declaration setting forth additional data and a new theory to the district court); *Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775 (Fed.Cir.1985) (new expert testified in district court); *Gould v. Quigg*, 822 F.2d 1074 (Fed.Cir.1987) (both the PTO and the patent applicant offered new expert testimony); *Mazzari v. Rogan*, 323 F.3d 1000, 1004–05 (Fed.Cir.2003) (allowing a large volume of new evidence offered by the applicants and the PTO including new experts and prior art references); *see also Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1346–48 (Fed.Cir.2000) (allowing new evidence of commercial success to be introduced in the district court proceedings); *Genentech, Inc. v. Chiron Corp.*, 220 F.3d 1345, 1351 (Fed.Cir.2000) (permitting four new experts to testify despite the fact that none of them had offered any testimony by declaration, affidavit, or otherwise during proceedings at the PTO). We have repeatedly held that a § 145 applicant is "entitled" to and may "choose" to introduce additional evidence. *See Mazzari*, 323 F.3d at 1004–05 ("A section 145 review ... affords the applicant an opportunity to present additional evidence or argue the previous evidence afresh," and "[i]f the parties choose to present additional evidence to the district court ... the district court would make *de novo* factual findings."). In

---

**3.** *See also Butler v. Shaw*, 21 F. 321, 326 (C.C.D.Mass.1884) (distinguishing between the patent applicant's right to appeal where "that court acts strictly as a court of appeal in the matter ... the hearing is summary, and is confined to the specific reasons of appeal, and to the evidence produced before the commissioner" and the patent applicant's right to file a "bill in equity" under section 4915, which is

"a suit within the ordinary jurisdiction in equity of the courts ... the statute contains no provision requiring the case to be heard upon the evidence produced before the commissioner ... as has been held in this and other circuits, the court may receive new evidence, and has the same powers as in other cases in equity").

*Newman v. Quigg,* 877 F.2d 1575 (Fed.Cir. 1989), we held that the PTO could introduce several new reports, declarations, and affidavits not submitted during the PTO proceedings explaining:

> A district court action under 35 U.S.C. § 145 is a *de novo* determination of patentability. It is not limited to the record before the PTO. Unless a party is prejudiced thereby or due process is denied, expeditious justice is better served by avoiding artificial restrictions on the district court's authority to resolve all issues reasonably raised in the proceeding.

*Id.* at 1579 (citation omitted). These cases illustrate the great magnitude of the majority's departure from decades of practice in which both parties believed such evidence admissible. The majority's decision to start excluding evidence in § 145 actions is contrary to the statute, legislative history, Supreme Court precedent, and the long-standing practice of considering such evidence in our cases.[4]

## II. The New *Alton* Rule for Excluding Evidence

After a lengthy discussion of the hodgepodge of standards that were applied in the few regional circuits that had excluded evidence from district court proceedings, the majority affirms the district court's exclusion of evidence.[5] The authority, ac-

---

**4.** Although not considered below or raised or argued by the parties on appeal, the majority contends that the APA requires "[s]ome restrictions on the ability of an applicant to introduce new evidence in a § 145 action." Maj. Op. at 1270. There is little doubt that, as a general matter, the APA applies to PTO actions. *Zurko,* 527 U.S. at 165, 119 S.Ct. 1816. But *Zurko* acknowledged that § 145 allows applicants to "present to the court evidence that the applicant did not present to the PTO. The presence of such new or different evidence makes a factfinder of the district judge." *Id.* at 164, 119 S.Ct. 1816. And in a case considering the applicability of *Zurko* to § 145, we stated that "[a] section 145 review is distinct from a section 141 appeal in that it affords the applicant an opportunity to present additional evidence or argue the previous evidence afresh." *Mazzari,* 323 F.3d at 1004. While *Zurko* and *Mazzari* concerned the standard of review, both cases considered the APA and both cases proceeded on the uncontroversial premise that the applicant can "choose" to present "new or different evidence" in a § 145 action. Further, as explained in detail *supra,* the language and legislative history of § 145 resoundingly support the admissibility of new evidence in § 145 actions. *Cf. Chandler v. Roudebush,* 425 U.S. 840, 862, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976) ("Here, by contrast, there is a 'specific statutory authorization' of a district court 'civil action,' which both the plain language of the statute and the legislative history reveal to be a trial de novo."). The APA does not limit new evidence in a § 145 proceeding to live testimony

to resolve credibility issues as the majority asserts. Maj. Op. at 1270–71.

**5.** To the extent that regional circuits or lower courts excluded evidence in § 145 actions, there is considerable disagreement as to the standard that ought to govern the exclusion of such evidence (gross negligence, intentional suppression, bad faith, or negligence/diligence). *See, e.g., Case v. CPC Int'l, Inc.,* 730 F.2d 745, 752 (Fed.Cir.1984) ("We are aware that this provision *has received varying interpretations in the circuits.* In our view, since an action under 35 U.S.C. § 146 has the hybrid nature of an appeal and a trial de novo, the statute authorizes the district court to accept all proffered testimony on issues raised by the parties during the proceedings below or by the board's decision." (emphasis added)). In fact, the negligence/diligence standard applied in this case was recently rejected by the very court from which this appeal comes:

> As a threshold matter, the Court must determine whether plaintiff may, under Section 145, offer the four new declarations not previously submitted to the Board.... Defendant contends that the Court should not consider these new declarations because they were not previously submitted to the Board.... There is no indication here that plaintiff's failure to introduce the four declarations rises to the level of fraud, bad faith, or gross negligence.
>
> Defendant, however, points to a handful of cases in this Court, which have adopted

cording to the majority, is *In re Alton*, 76 F.3d 1168, 1175 (Fed.Cir.1996). The majority holds that by failing to offer his testimony to the PTO, Hyatt has failed to satisfy "an affirmative and specific duty." Maj. Op. at 1248. In this way, this new affirmative duty for prosecution seems to resemble inequitable conduct, though here the applicant is penalized regardless of their intent. The majority explains: "Hyatt was obligated to respond to the examiner's written description rejection by *In re Alton*, 76 F.3d 1168, 1175 (Fed.Cir. 1996), by explaining where in the specification support for each of these limitations could be found." Maj. Op. at 1274.[6] The majority continues: "Hyatt was clearly on notice of his obligation to provide evidence or explanation to the examiner to rebut the written description rejections," Maj. Op. at 1276, and "he was required by law" to provide it. Maj. Op. at 1275. With all due respect to the majority, I do not believe a new "affirmative duty" to disclose is warranted, nor do I believe Hyatt was "required by law" or "obligated" to provide his declaration to the PTO. While Mr. Hyatt may have failed to overcome the rejections or to convince the Board based upon his submissions to the PTO, he did not fail to fulfill an "obligation" or "affirmative duty" as the majority alleges.

an even more stringent standard for the consideration of new evidence. Defendant relies primarily on *Hyatt v. Dudas,* in which Judge Kennedy declined to consider new evidence "negligently submitted after the end of administrative proceedings." This articulation of the "new evidence" standard represents a significant departure from the PTO's guidelines and, as plaintiff argues, would "render an appeal under § 145 . . . nearly indistinguishable from a direct appeal to the Federal Circuit, and would render the purpose of the statute duplicative and meaningless." The Court therefore declines to adopt the *Hyatt* standard for considering new evidence in this case. *Hitachi Koki Co. v. Dudas,* 556 F.Supp.2d 41, 47 (D.D.C.2008) (citations omitted).

The majority uses *Alton* to create an "affirmative duty" with which patent applicants must comply. *Alton* does not justify this new duty. *Alton* stands for the proposition that when the examiner makes a prima facie case for his written description rejection, the burden of coming forward with evidence or argument (burden of production) shifts to the applicant. *Alton,* 76 F.3d at 1175. And, this is true whether the examiner is rejecting a claim on the basis of anticipation, obviousness, enablement, written description or any other reason. *See In re Oetiker,* 977 F.2d 1443, 1445 (Fed.Cir.1992) ("[T]he examiner bears the initial burden, on review of the prior art *or on any other ground,* of presenting a prima facie case of unpatentability. If that burden is met, the burden of coming forward with evidence or argument shifts to the applicant."); *see also Manual of Patent Examination Procedure* § 804 ¶ I.A (8th ed., rev. 2008); *id.* § 2106 (patentable subject matter), § 2107.02 (utility), § 2112 (inherent anticipation), § 2142 (obviousness), § 2163.04 (written description), § 2164.04 (enablement), § 2184 (equivalents). Once the examiner makes a prima facie case, the applicant then has the burden of coming forward with evidence to rebut that prima facie showing.

**6.** The majority suggests that there is only one way to respond to a written description rejection. Maj. Op. at 1278 ("There is, under *Alton* only one acceptable response to a written description rejection: showing the examiner where by column and line number in the specification he may find written description support for each disputed claim limitation."). With all due respect, this not correct. Written description rejections can be addressed by arguing, for example, that the examiner failed to set forth a prima facie case, by amendment, by adjusting a priority claim, or by pointing out common alternative definitions for a claim term known to one of ordinary skill in the art. There is not simply one way an applicant can or must respond, and we should not micromanage prosecution.

Because the same burden shifting occurs with regard to every type of rejection an examiner makes, this new affirmative duty is not limited to the written description issue reviewed in *Alton*. Hence if the burden shifting creates "an affirmative duty" then this affirmative duty comes into existence every time an examiner makes a prima facie case and rejects claims. I cannot agree with the per se rule that an applicant is deemed to have willfully withheld anything he possessed during prosecution that was responsive to a rejection regardless of the applicant's actual intent. Willfulness always requires intent and is simply not compatible with the majority's strict liability approach.

III. Mr. Hyatt's Evidence

In this case, the district court found that Mr. Hyatt's failure to proffer his declaration to the PTO was merely negligent. *Hyatt v. Dudas*, No. 03–0901, 2005 WL 5569663, at *7 (D.D.C. Sept.30, 2005) ("*Hyatt II*") ("Hyatt's failure to explain why he didn't submit his declaration earlier is negligent, and the district court need not consider evidence negligently submitted after the end of administrative proceedings."). There has been no finding of bad faith, fraud, willful withholding, intentional suppression or even gross negligence in this case. The PTO did *not* argue to either the district court or this court that the facts in this case would establish intentional suppression or willful withholding by Mr. Hyatt. Rather, the PTO argued that the facts established that Mr. Hyatt acted negligently or in the alternative grossly negligently. Appellee's Br. 51–53. In fact, the PTO argues that Mr. Hyatt's focus on "intentional or deliberate conduct misses the point." Appellee's Br. 51. Analogizing the present case to *Schering Corp. v. Marzall*, 101 F.Supp. 571 (D.D.C.1951), the PTO distinguishes between suppression on the one hand and evidence withheld without sufficient excuse

on the other. *Id.* at 34–35. If the majority would like the willful withholding standard to be applied and for fact findings to be made accordingly, it must vacate and remand for the district court to do so in the first instance. Because willful withholding was not argued by the parties or considered by the district court, we as an appellate court simply cannot know the volume of evidence that may exist on the issue nor are we in a position to judge Mr. Hyatt's credibility.

I find troubling the majority's characterizations of Mr. Hyatt. *See, e.g.,* Maj. Op. at 1275 (Mr. "Hyatt purposefully kept [the Board] in the dark"); *id.* (his "blatant noncooperation"); *id.* at 1275 (Mr. "Hyatt willfully refused to provide evidence in his possession"); *id.* (Hyatt "refused to cooperate"); *id.* ("Hyatt's willful non-cooperation"); *id.* at 1277 ("Hyatt willfully refused"); *id.* at 1274 (providing his declaration "should have been simple for him"); *id.* at 1277 (that Hyatt's failure "to perform a simple task that it was his burden to perform is inexcusable"); *id.* at 1277 ("Hyatt's perverse unhelpfulness"). None of this appears in the district court proceedings, the PTO proceedings, or the record–these fact findings ought to be left to the district court which is in the best position to weigh the contradictory evidence.

Contrary to the appellate finding of willful withholding, the record contains ample evidence of a lack of willful withholding. Here, the examiner rejected all of Mr. Hyatt's 117 claims for lack of written description, failure to enable, obviousness-type double patenting (over 8 separate references), and *Schneller*-type double patenting (over the same 8 references). The examiner also rejected 9 claims as anticipated (*Hill* reference) and 7 as obvious (over a combination of three references). Technically, Mr. Hyatt was appealing 45

separate issues totaling 2546 separate rejections of his 117 claims to the Board. He wrote a 129–page appeal brief addressing *all* of these different rejections.[7] And, to be clear, the Board reversed *all* the examiner's rejections for obviousness, anticipation, obviousness-type double patenting, *Schneller*-type double patenting, and many of the written description and enablement rejections. With regard to the written description rejections in particular, the Board reversed the rejections of 38 claims and sustained the rejections of 79 claims. Mr. Hyatt prevailed on 92% of all the examiner's rejections at the Board level. Despite Mr. Hyatt's success, the majority declares Mr. Hyatt's response to be "completely and wholly inadequate" and Mr. Hyatt to have been perversely unhelpful. Maj. Op. at 1277, 1278.

With respect to the written description issue, Mr. Hyatt responded to the rejections—as the majority explains—with thirty six pages of argument and Table–1. While the Board criticizes Table–1, the Board reversed thirty-eight of the examiner's rejections for lack of written description and in some cases relied upon exactly the information referenced in Table–1. For example, the Board found support for "a data decompressed video image input circuit generating data decompressed image information" (in thirty-three claims) on page 23 of the 236–page specification, the exact and only location where table–1 says the terms "data compressed" and "decompressed" appeared. *See, e.g., Ex Parte Hyatt*, No. 2000–2049 (B.P.A.I. July 30, 2002) at 19–20. Although Mr. Hyatt may have failed to overcome all of the written description rejections based upon his submissions to the PTO, he did not fail to fulfill an "obligation" or "affirmative duty," and he certainly was *not* "perversely un-

helpful" as the majority alleges. With all of these facts, and no one arguing willful withholding, should we be finding it in the first instance? I believe the court is wrong to hold that breach of the newly created affirmative duty, i.e., not producing evidence to the PTO, is willful withholding as a matter of law.

It is helpful to compare these facts to one of the only examples of willful withholding, where a court excluded evidence of reduction to practice where the assignee corporation expressly refused to disclose and to allow their witnesses to answer questions before the PTO in order to maintain a commercial advantage. *Barrett*, 22 F.2d at 396 ("[T]he Barrett Company forbade them to answer."). *Barrett* represents an extreme and unwarranted position, and the majority chooses to go far beyond even that standard. Mr. Hyatt's conduct here hardly rises to the level of the Barrett Company. There is no evidence that Mr. Hyatt intentionally withheld information to retain some commercial advantage, as in *Barrett*. Rather, the majority concludes that where an applicant fails to convince the PTO of his position, he is foreclosed from bringing in new evidence to further that position in a § 145 action, regardless of whether he believed he had submitted adequate evidence to the PTO—i.e., regardless of the applicant's intent.

In hindsight, perhaps Mr. Hyatt should have submitted his declaration or that of any other expert earlier in the prosecution process. But hindsight is misleadingly acute. Declarations and expert reports are time consuming and expensive to prepare. It is hardly reasonable or even desirable to require patent applicants to put massive declarations into the record at an early stage of prosecution, weighing the

---

7. Mr. Hyatt prosecuted his patent application *pro se*. This is not to suggest that Mr. Hyatt is unsophisticated, as he is an inventor with several patents to his credit and a patent agent.

cost to both the applicant and the PTO. *See generally* Mark A. Lemley, *Rational Ignorance at the Patent Office,* 95 Nw. U.L.Rev. 1495 (2003) (arguing that it would be inefficient for the PTO to overinvest in examination because so few patents are enforced). In this case, for example, the examiner rejected the claims on many different bases (double patenting on 8 different references, obviousness, anticipation, enablement, written description, etc.), totaling 2546 separate rejections. The Board overturned nearly all of them. It is easy with the benefit of hindsight to say Mr. Hyatt should have introduced more evidence on written description to the Board. But Mr. Hyatt was not facing merely a written description rejection, he was facing 2546 separate rejections on many, many different bases. The majority implausibly asserts that 2546 separate rejections is "proportional to Hyatt's prosecution of an application containing 117 pending claims spanning 79 pages." Maj. Op. at 1278 n. 35. An average of 21 rejections per claim is hardly proportional. Mr. Hyatt was forced to appeal 45 independent issues to the Board when the average is two. Dennis D. Crouch, *Understanding the Role of the Board of Patent Appeals in Ex Parte Appeals,* 4, available at http://papers.ssrn.com/sol3/papers.cfm? abstract_id=142392295. Despite this challenge, Mr. Hyatt was largely successful on appeal. Further, the length of Mr. Hyatt's application suggests that his efforts to pinpoint pages containing certain terms was helpful and in good faith. Mr. Hyatt's response may have been especially valuable in the time before searchable electronic applications.

To say that Mr. Hyatt had an affirmative duty to introduce all evidence to the Board or that he "owed" (Maj. Op. at 1278) all the evidence he possessed is to put an enormous and undesirable burden on the patentee, one that will foreclose patent protection for many small inventors. Con-

gress foresaw exactly this problem and ameliorated it with § 145 by providing applicants a way to initiate a civil action and introduce new evidence after Board proceedings when the issues are much more succinct and consolidated. This is illustrated perfectly here, where the applicant was contending with 2546 rejections on many different bases before the Board. After the Board overturned nearly all of them, only a small number of rejections— based on written description/enablement— were maintained. Hence at the district court the applicant could proffer much more extensive evidence because the universe of issues was greatly narrowed. This is the sensible approach Congress enacted. The statute even places the cost of the proceeding on the party better positioned to know the value of the application—the applicant. The majority's new exclusionary rule based upon its new affirmative duty upsets this balance.

## CONCLUSION

In this case, the majority blurs the line between an appeal pursuant to § 141 and the civil action of § 145. The admissibility of new evidence is exactly what distinguishes § 145 from § 141. "We must be vigilant to preserve to patent applicants the alternative procedures that the law provides, and to preserve the historical distinction between them." *Fregeau,* 776 F.2d at 1041 (Newman, J., concurring-in-part). The legislative history and Supreme Court precedent make clear that the hallmark distinction is the admissibility of "all competent evidence," "to build up a new record," "to start *de novo* in court," "and file testimony bringing in evidence that they could have brought in before [the PTO] but did not bring in before." This evidence, admissible in this civil action, should be governed as the Supreme Court indicated by "equity practice and procedure," i.e., the Federal Rules of Evidence and Civil Procedure.

Since only the presence of new evidence invokes the *de novo* standard of review (otherwise the district court will give the Board fact findings substantial evidence deference, *see Fregeau,* 776 F.2d at 1038), the majority's decision in this case makes the § 145 action virtually indistinguishable from an appeal under § 141. This version of a "civil action" under § 145 is contrary to Congressional intent and to the Supreme Court's rulings. While it is sound policy to encourage full disclosure to administrative tribunals such as the PTO, we are not the body that makes the decision of how best to do this. Congress held numerous hearings over this legislation, considered the concerns over permitting a civil action, and decided to enact the legislation despite these concerns.

Mr. Hyatt did not fail to fulfill an affirmative duty or obligation and he should not be penalized. I believe Congress gave Mr. Hyatt the right to have his own declaration considered as part of the evidence in the § 145 civil action at the district court, and therefore I must dissent from the majority's constriction of this patent applicant's rights.